THALIA BISHOP, Appellant, v. ELIZABETH SCHARF, Appellee.

No. 41163.

FEBRUARY 16, 1932.

REHEARING DENIED JUNE 24, 1932.

STEVENS, J.—This is a contest of the will of Mrs. Mary Bishop, who died at Sioux City, Iowa, March 29, 1930. Her husband died in 1918. She is survived by two daughters, Thalia

Bishop, the proponent, and Elizabeth Scharf, contestant, and a son, Frederic Bishop. Testatrix resided in Sioux City all of her life. Her estate consists of her home and other property of the estimated aggregate value of $40,000. By the terms of her will, she gave contestant and Fredcric each $5000 and the remainder to her daughter Thalia, appellant herein.

The will is contested upon the sole ground that testatrix was without mental capacity to execute the same. The son at the time of her death resided in Texas; the contestant, who is married and has a son fourteen years of age, and the proponent live in Sioux City. The latter lived at home with her parents substantially all of her life. She was married but divorced in about two years. She and her husband resided at the home of her parents.

Testatrix is described as a small and rather frail woman. Early in December, 1929, she was stricken with an illness which resulted in the paralysis of her left arm and other conditions which confined her thereafter to her bed. On Sunday morning, December 1st, she was found by proponent lying upon the floor of her home unconscious. The room in which she was lying gave the odor of escaping gas. The contestant and a physician were immediately called, and very shortly thereafter a trained nurse was employed. Testatrix regained full consciousness in about forty-eight hours, but, as stated, was never thereafter able to go about the house.

Proponent moved for a directed verdict at the close of the contestant's testimony, and this motion was renewed at the close of all the evidence. The motion was overruled by the court and the issue of testamentary capacity submitted to the jury.

Russell Marks, the attorney who drew the will, was deceased at the time of the trial. He had previously been the attorney of both testatrix and her husband. Testatrix was attended during her illness by Dr. Dean, who saw and conversed with her daily. Numerous witnesses called in behalf of contestant also had ample opportunity to observe the conduct, conversation and habits of testatrix. We will first give consideration to their testimony.

A neighbor, Claus P. Youngdahl by name, testified that he had known testatrix for forty years; that he frequently talked

to her; that she was a quiet, strict woman during all of the time he had known her, except during her illness; that he lifted her out of bed four times; that she was worn, greatly reduced in weight, did not recognize him until informed who he was; that on a visit in January she asked him if he had planted a garden yet, and said, ''I will buy the seed and you go ahead and plant it;'' that he told her there was lots of time yet; that she did not call him by name at first.

Another neighbor, Mrs. Kuklantz, frequently visited the Bishop home. She testified that testatrix was dignified, quiet and neat; that she was employed at her home from six o'clock in the evening for from one to two hours, to take the place of the trained nurse; that she stayed in the room and looked after testatrix; that she was thin, wasted away and getting thinner; that she spoke of going to California, and apparently thought that a few vacant lots near by were the ocean; that she did not talk connectedly; that before her illness she was not flighty, objected to jokes, was reserved, dignified, and did not believe in foolishness; that she had trouble with her calls of nature, and that on two occasions the witness had to clean up after her; that she thought she was on the bedpan when she was not, and asked the witness to remove it; that she was going to take the bedpan and pack it on the trunk when she went to California, was going to paint it green, and was going to rent it out on her way; that she cried at intervals; that she invited the witness and her children for Christmas dinner when she got to California; that she wanted to take the fireplace from the library to the living room; that she spoke of fertilizing a rose bush with the contents of the bedpan; that she called for and used old rags in the bed; that when she would hear Rudy Vallee sing over the radio she would say he was her sweetheart; that when he was singing a love song she would imitate him, and say ''I love you, I love you'' in a loud voice; that on occasions she did not recognize her; that she failed to ask for the bedpan when she needed it. The incidents relating to Rudy Vallee and concerning the rose bush occurred when only the witness was present.

Ella Turner, another witness who was a practical nurse, assisted in caring for testatrix, did some of the housework, and waited on the patient when the regular nurse was absent. She

testified that testatrix spoke of keeping the witness through the summer, paying her $20 or $25 a week; that she in fact received $8.00; that testatrix would stare at her and often would not reply to any remark made to her; that her left side was paralyzed, especially the lower limb; that she did not converse with her much because it was contrary to instructions, and any way there was no satisfaction in talking with her.

Mrs. Youngdahl, another witness, testified to some of the same or similar incidents to those already detailed.

Contestant was also called as a witness, and testified to a few incidents corroborative of the testimony of prior witnesses, and that on one occasion her mother spoke of her having a little girl, when in fact she had no girl; that she said that Mrs. Winter, the housekeeper, had a son who went to school with contestant, which was wholly untrue; that her mother was foolish during her illness and would laugh and giggle.

A witness by the name of Gray, who had known both testatrix and her husband for many years, testified that he was called to the Bishop home about Christmas by contestant; that upon his arrival testatrix told him she was out of money; that she would have to sell some of her securities which Gray looked after for her; that there were bills for groceries and other domestic expenses that would have to be paid. An examination of her bank book showed that she had a small checking account and $1700 in a savings bank. A power of attorney was given to Gray, authorizing him to draw the money out of the savings account and deposit it in her checking account. He testified that friction developed in the family and that about two weeks later the power of attorney was revoked. He observed that testatrix was growing thinner and weaker and was unlike herself.

No other testimony touching the mental competency of testatrix was introduced by contestant in chief. Some of the witnesses were called in rebuttal and enlarged considerably upon their prior testimony, stating a few additional instances occurring while they were present during the illness of testatrix. To one witness she said that there was a loaf of bread in her nightdress. This witness testified that her conversation was incoherent and foolish; that her former refined and dignified demeanor had changed, and that she sought to be facetious,

somewhat indifferent as to her language, and that her conversation was frivolous and childish.

Each of the above-named witnesses, basing their answers upon the facts testified to by them respectively, expressed the opinion that testatrix was of unsound mind. None of the witnesses called by contestant were present at the time of the execution of the will.

In addition to the foregoing, Dr. Kolodny was called as a witness by contestant in rebuttal. This witness never saw testatrix, and his testimony as to her mentality was based upon the facts and incidents told to him. This witness qualified as an expert, was formerly professor of neurological surgery of the Iowa State University, has pursued the study of medicine in various institutions and countries, and was for a time in the National Hospital in London, specializing in the diagnosis of diseases of the brain and spinal cord. This witness expressed the belief that the frontal lobe of testatrix's brain was affected; that she had a cerebral hemorrhage such as would necessarily affect her mind; that the paralysis of the left arm and face was a definite symptom of that condition. The witness further testified that the change in the habits and personality of the testatrix noted by the witnesses for contestants was symptomatic of the mental condition which exists as the result of cerebral hemorrhage of the frontal lobe of the brain; that the transformation in the life of testatrix from dignified, refined and strict conduct to indifference, to attempted facetiousness, to carelessness in the choice of her language, was a concomitant of mental deterioration; that from the evidence it was apparent that testatrix did not have proper or normal orientation; that the change in her habits and conversation was due to the loss of proper control of her faculties; that wetting the bed was due to indifference or the paralysis of the sphincter muscles; that her changed personality was symptomatic of a disturbed condition of her brain. This witness in answer to a hypothetical question which included substantially all of the incidents mentioned by appellee's witness stated that testatrix was of unsound mind.

We turn now to a recital of the evidence introduced on behalf of proponent. Dr. Dean, the attending physician, who had known testatrix for many years, testified that when he arrived at her home on the morning of December 1st, very

shortly after she was stricken, he found her lying on the floor unconscious; that he saw her again in the evening, when she was semi-conscious and appeared to recognize things slightly; that at the end of forty-eight hours, her drowsy condition had disappeared and she recognized him and he was able to make a fairly accurate diagnosis as to the extent of her trouble and injuries; that he was then able to converse with her; that she was rational; that there was an abrasion over the right side of her face and head; that she had a cerebral hemorrhage; that the paralysis following affected her left arm but not her leg; that in about ten days she complained of pain in her left knee and inquired if she had broken her leg or hip; that the soreness and pain in her knee was due to arthritis; that the stroke had nothing whatever .to do with it or with her death later; that the first month he called twice a day, and thereafter as often as was necessary; that testatrix had gall bladder trouble, high blood pressure, but that she was mentally alert to everything; talked about her "bum knee," about her outdoor activities and travels, and, as the time for the spring city election approached, manifested a keen interest therein in favor of certain candidates, expressing the belief that they would be elected; that about the 5th of February her general condition was improved; that she was able to · sit up some, by being helped out of bed into a chair, her principal difficulty being the soreness and pain in her knee; that there was no particular change in her condition until about the first of March; that she had cancer of the gall bladder, which finally resulted in excessive vomiting and finally caused her death. He further testified that while testatrix was quiet and dignified, she was possessed of a keen sense of humor; that she talked from time to time about her food, the manner in which it was prepared, complained slightly about it, told him about the power of attorney, talked to her daughters; that upon one occasion when he was unable to respond to her call, she chided him, saying, "Now, doctor, when I call you, I want you to come, because I am going to pay you for it, and I want you to come;" that she was interested in and talked about her old friends; that he heard no improper or undignified language at any time; that nothing was said in his presence about the bedpan; that testatrix's conversation was coherent, intelligent; and that in his judgment she was of sound mind.

Dr. Koch accompanied Dr. Dean to see her about ten days after the will was written, and testified that testatrix was in bed and gave him a history of her trouble; that she knew what she was doing, knew him, where she was, the time of year, except she was confused as to the day. She knew who was president of the United States and talked intelligently. This witness testified that he is not an alienist and did not testify as an expert.

Mrs. Thompson, the trained nurse, who was present and attended testatrix during the whole period of her illness, testified in general as to the condition of testatrix, the restoration of consciousness following the stroke, and to the care and attention made necessary by her illness. She testified that she never heard her use questionable language or speak incoherently; that her conversation was intelligent; that she improved so that she was able to sit up in a chair a part of the time; that she narrated many instances in her life, speaking of her travels, which had been somewhat extensive, talked concerning the approaching city election, told of her relatives who resided in the east; that she had a sense of humor and joked with her; that there was no difficulty when she was present about the bedpan until very shortly before she died; that she had several teeth extracted during her illness; that for a time she cried considerably, and finally said she wanted to see her son Frederic, who was in Texas, and that if he was unable to come, she would send him the necessary money; that he came, and after he went away, she was quiet and did not cry.

One or more of the witnesses for contestant told about the purchase, at the request of testatrix, of seven bed blankets. This, the witness testified, was because of the trouble with testatrix's left knee. She ordered a light wool blanket, and after it was placed on the bed it pleased her, and she had other blankets procured and put on other beds. The witness heard no other conversation concerning the bedpan or of testatrix's taking it to California, but said that one of the daughters, who is an artist, spoke about painting roses on it. Never heard her say that she had a loaf of bread in her dress, but that, as her meals were given to her in bed, crumbs would accumulate and had to be removed. Testatrix enjoyed her food up to the last of February, when she began to vomit. The witness was present

when Gray returned the bank books and other papers which had been turned over to him.

Numerous other witnesses who were acquainted with testatrix testified to conversations with, and observations of, her during her illness; that she was coherent; that except for two or three minor instances, they saw nothing unusual or out of the ordinary in her conversation or conduct. Concerning the garden incident to which one of the witnesses testified, it was shown that the witness and testatrix had previously maintained a sort of joint garden, and that her checking account at the bank was substantially depleted, and that money was, in fact, necessary to pay the domestic bills. None of the witnesses heard any conversation about the bedpan, the ocean, or other forms of delusions referred to by some of the witnesses for contestant.

We come now to the testimony of the two surviving witnesses to the will who were present and saw and heard what was done and said on that occasion. The will was executed February 5, 1930, at the home of testatrix. The scrivener who wrote the will was Russell Marks. Mrs. Allen, Marks' stenographer, and the trained nurse were present and signed the will as witnesses at the request of testatrix. While the scrivener was preparing the instrument in another room, Mrs. Allen testified that she sat by the bedside of testatrix and conversed with her; that they talked about the weather, the nurse who was out of the room, and other commonplace matters. She spoke of the location of her home, the trees and grounds surrounding it; said she was going to have some garden and flowers when summer came. She spoke of having some teeth extracted and that she was glad it was done. When the will was completed, the scrivener handed it to the witness, who sat by the bedside and read it to testatrix. The reading completed, the witness inquired if there was anything in the will that she desired read again. Testatrix said "No; it is just like the lead pencil copy Russell read to me." It appears that the will was first written out in lead pencil and then copied by the scrivener with a pen. Both drafts of the will were introduced in evidence. The nurse was not present when the will was read to testatrix. After the reading was completed, Marks and the nurse went into the room, and he said, "Now, Mrs. Bishop, I am going to go all over this again before Mrs. Thompson and Mrs. Allen." He

then stated practically everything that was in the will and discussed the different phases of it. He asked the testatrix if the $5,000 legacy should be made a charge on the real estate, and she said, ''No, she did not want it to be made a charge thereon.'' When the conversation was completed testatrix was propped up in bed, a pen was brought to her and she signed the instrument. It was then signed by the witnesses. Asked what she desired done with the will, testatrix stated that she desired that Marks take it and take care of it. She then inquired about a former will and was advised to destroy it. She said she would send Thalia after it. She requested that none of the children be told about the will or its contents; and said that she had discriminated against Elizabeth and Fred because they had been mean to her. She said: ''They wanted to send me to the hospital and shut up the house and kick Thalia out. * * * I cannot live without Thalia. She has been good to me.'' The testimony of the nurse as to what was said on this occasion after she entered the bedroom was substantially the same as that of Mrs. Allen.

Proponent testified at length as to her relationship with her brother and sister and as to her observations of her mother during her illness. She is a music teacher, and was absent from the house a portion of the time, giving music lessons. She never saw any signs of mental impairment; her mother appeared normal to her. There was evident friction between her and her brother and sister. It appears that during much of the time she paid her mother money for the privilege of living at home.

We deem it unnecessary to set out in detail the testimony of all of proponent's witnesses. They saw and heard none of the incidents referred to by the witnesses for contestant, and each expressed the opinion that testatrix was at all times of sound mind.

Many of the incidents referred to are more or less trivial, standing alone. They do have some significance when viewed in the light of Dr. Kolodny's testimony. The alleged change in the manner, conversation and views of the testatrix, according to his testimony, was symptomatic of a weakened and weakening mentality, the extent of which the witness manifestly could not accurately state. The important and controlling fact in the case is the condition of testatrix at the very time the will was

executed. It is not sufficient to impeach the validity of the instrument merely to show that testatrix had cerebral hemorrhage in the front part of the brain on the right side; that her mentality was to some extent weakened and impaired; that she had defective memory; that she was unable, upon all occasions, to recognize her acquaintances and friends; that she manifested some change from the quiet dignity and culture formerly observed, to an altered personality and an inclination toward facetiousness and, to some extent, indifference to the character of her speech and conversation.

The test of mental capacity has been many times stated by this court. Testamentary capacity exists if the testator has sufficient mentality to understand the nature and purpose of the instrument about to be executed, to remember and possess sufficient capacity to know the extent and nature of his property; to know and comprehend the distribution which he desires to make thereof; and to remember and know those having claims upon his bounty. Capacity to transact business generally, to make contracts, and to carry on difficult negotiations are not essential to testamentary capacity. Byrne v. Byrne, 186 Iowa 345; Womack v. Horsley, 178 Iowa 1079; In re Estate of Cooper, 200 Iowa 1180; In re Will of Kester, 183 Iowa 1336; Cookman v. Bateman, 210 Iowa 503; Seamans v. Gallup, 195 Iowa 540; Firestine v. Atkinson, 206 Iowa 151; Waters v. Waters, 201 Iowa 586; Sutherland State Bank v. Furgason, 192 Iowa 1295; Bailey v. Cherokee State Bank, 208 Iowa 1265; In re Will of Richardson, 199 Iowa 1320. See also White v. White, 213 Iowa 1244.

Mental weakness due to disease does not deprive one of testamentary capacity until it has progressed to the extent that the power of intelligent action has been destroyed. Mere forgetfulness and enfeeblement of the body are not alone sufficient to disqualify one from making a will. The disqualification which deprives one of testamentary capacity must exist at the very time of the execution of the instrument. Testatrix was at no time after she regained consciousness unable to converse and talk with those about her bedside. The nurse was her constant companion, and she testified that, except when sleeping, Mrs. Bishop was capable of carrying on intelligent and interesting conversation. There can be no question of the sufficiency of

the testimony of the witnesses who were present at the time the will was executed, if accepted as true, to establish testamentary capacity. No one would contend otherwise. The credibility of the witnesses and of their testimony, of course, is to be determined by the jury, and it is not the province of the court to pass thereon. If, under the facts and circumstances disclosed in the record, due regard being had to the law applicable thereto, the jury might find that testatrix was of unsound mind when the will was signed, the verdict should be permitted to stand.

Reference by testatrix to the Atlantic Ocean, to making garden in January, to the various phases of and episodes relating to the bedpan, her changed habits and personality, coupled with the other incidents and circumstances shown in evidence, may tend in some degree to indicate impairment of the mental faculties. The conclusion of Dr. Kolodny that these are unfailing indicia of progressive mental impairment due to cerebral hemorrhage would, of course, present an issue of fact for the jury to determine, if, when considered as a whole, testamentary incapacity as defined by law is proven. This witness, who never saw testatrix, and whose testimony was based entirely upon hypothetical facts, could not in the very nature of the case determine the precise extent of the area affected by the lesion or of the impairment resulting therefrom. This is shown by his own admissions. The progress of the deterioration of the brain is, as we understand his testimony, determined by the extent of the area involved. At least this is true as a general proposition. It may be conceded that such impairment, if any is shown, was progressive, and that the patient would become less and less mentally competent to transact business as the hour of death approached. There is, however, nothing in the record of this case from which the exact mental status of testatrix, even considering and giving full force and effect to the testimony of contestant at the instant the will was executed, may be determined,— that is, from appellee's standpoint. The burden of proof at this point was upon contestant to prove testamentary incapacity at that time. The case presented is not one of a condition of senility, insanity or other mental decay, permanent in character, which, once established, will be presumed to continue. The most that can be claimed is that there was some decline from the normal condition. The testimony for proponent as to

the mental condition of testatrix at the time the will was executed, of her knowledge of and the extent of her property, her recollection of those having claims upon her bounty and the disposition she desired to make of her estate, is overwhelming against any inference that may be drawn from the testimony in behalf of contestant.

It is true that discrimination was made in favor of proponent against her brother and sister and that she was doubtless given the bulk of the estate. Testatrix, if possessing testamentary capacity, had a right to make such discrimination. The opinions expressed by lay witnesses are no stronger than the facts upon which same are based. The opportunity of Dr. Dean, Dr. Koch, and the nurse to observe the testatrix and to know at first hand the facts from day to day gives to their testimony significance and weight that cannot be given to conclusions based upon mere hypothetical facts. Many of the circumstances detailed by witnesses for contestant were trifling, and, standing alone, were of little, if any, probative value. The citation and discussion of the cases cited and many more to the same effect that might be cited would prolong this opinion without profit to anyone.

After a careful and painstaking examination and consideration of the entire record, we reach the conclusion that the evidence introduced to prove testamentary incapacity was not sufficient to justify the submission of that issue to the jury, and we are of the opinion that the issue should, upon the record, be disposed of as a question of law. The judgment is, accordingly, reversed.—Reversed.

EVANS, FAVILLE, DE GRAFF, ALBERT, MORLING, KINDIG, and GRIMM, JJ., concur.