IN RE ESTATE OF ELLEN B. HAYER.

J. C. DANIELSON et al., Proponents, Appellants, v. VERA HAYER REDENBAUGH, Special Administratrix, Contestant, Appellee.

No. 45472.

AUGUST 4, 1941.

REHEARING DENIED JANUARY 16, 1942.

R. B. Hawkins and Herrick, Sloan & Langdon, for proponents, appellants.

Messer & Cahill, O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, for contestant, appellee.

WENNERSTRUM, J.—Ellen B. Hayer, whose will is the occasion for this litigation, was a resident of Lamoni, Iowa. She died on February 8, 1940. Her purported will had been executed on February 7, 1939. Objections to the probate of this instrument were filed by Vera Hayer Redenbaugh, an adopted daughter of Ellen Hayer. There were no children born to Ellen B. Hayer and her husband, Christian Hayer, who predeceased her on October 29, 1928. Vera Hayer Redenbaugh was the only adopted child. Mrs. Hayer was past 81 years of age at the time of her death.

The original objections to the probation of the will of Ellen B. Hayer were based on two grounds: First, that Mrs. Hayer was of such unsound mind at the time of the execution of the instrument that she did not have testamentary capacity to make a will and was wholly incompetent and incapable of making a valid will; second, that the purported will as executed by Mrs. Hayer was induced to be made through fraud, duress and undue influence. The court withdrew the issue of undue influence from the jury on the basis of insufficient evidence and the only question that was submitted for consideration was as to the mental capacity of the decedent at the time of the execution of the purported will.

The record in this case is very voluminous, it having taken two weeks to complete the trial of this case in the lower court. The briefs and arguments are also voluminous inasmuch as counsel for both proponents and the contestant have manifested pronounced industry in the presentation of their various con-

tentions relative to this litigation. It will be impossible to set out in detail the various questions raised or enumerate the various phases of the evidence presented. However, inasmuch as the primary question that is before us is as to the mental capacity of the decedent at the time of the execution of the purported will it seems incumbent upon us to first pass upon the question as to whether or not a jury issue was presented at the close of all the evidence and as to whether or not the court should have directed a verdict for the proponents on the question of the mental capacity of the decedent to make a valid will.

In passing upon any controverted issue, and in this particular case upon the question as to the sufficiency of the evidence relative to the submission of this case to the jury, certain guides or tests should be set up. Consideration should then be given to the evidence presented to the trial court for the purpose of ascertaining as to whether or not the facts presented bring them within the rules announced.

In this connection attention is called to the case of In re Fitzgerald, 219 Iowa 988, 996, 259 N. W. 455, 459, where this court makes the following pronouncement:

" * * *. The best test we know of for determining such a question is whether or not, had the case gone to the jury and it had found adversely to what it did in this case, the presiding judge would feel that, under all the record in the case, he would be warranted in setting aside such verdict.

"It is one of the fundamental rules laid down by our cases that the burden of proof is on the contestant to show that the deceased did not have sufficient mental capacity to comprehend the nature of the instrument he was executing, to recollect the property he meant to dispose of, the objects of his bounty, and the manner in which he wished to distribute his property among them. Our last expression on this proposition was in In re Will of Johnson, 201 Iowa 687, 207 N. W. 748. Mere old age, or some deterioration in physical or mental power, peevishness, childishness, or eccentricity, is not sufficient to carry to the jury the issue of mental unsoundness of the testator. Such was our pronouncement in In re Estate of Shields, 198 Iowa 686, 200 N. W. 219, and cases there cited. We further said:

" 'It is not the duty of the court, in disposing of a motion for directed verdict, to submit the case to the jury because there is some evidence introduced by the party having the burden of proof, unless that evidence is of such character that it would warrant the jury in finding a verdict in favor of the party introducing such evidence. Before the question is left to the jury for its determination, the preliminary question for the court is whether there is any evidence to support the verdict, and if so, whether, upon such evidence, the jury can find a verdict for the party producing it, that will stand.' "

See also Bishop v. Scharf, 214 Iowa 644, 653, 241 N. W. 3, 7, and cases there cited. Attention is also called to the case of In re Estate of Johnson, 222 Iowa 787, 793, 269 N. W. 792, 795.

As previously stated the occasion for this litigation was the purported will of Ellen B. Hayer. However, the evidence as permitted to be considered by the jury went far afield in connection with the consideration of matters pertaining to the will of Christian Hayer, the husband of decedent, which had been admitted to probate in 1928; and the deeding of a 320-acre farm in Wright County, Iowa by Ellen B. Hayer in 1930 to the general church organization of the Reorganized Church of Jesus Christ of Latter Day Saints of Independence, Missouri, commonly known as the Latter Day Saints Church. A great deal of consideration was given to this character of testimony during the trial but it shall be our purpose in passing upon the question of the mental capacity of the decedent to endeavor to restrict our consideration to the question as to the testamentary capacity of the decedent at the time of the execution of her will.

Upon the question of the necessary mental capacity of a person to make a valid will at the particular time a will was executed this court has frequently spoken. Our holdings, however, are thoroughly commented upon in the case of Bishop v. Scharf, supra, at page 652 of 214 Iowa, page 7 of 241 N. W., where it is stated:

"The important and controlling fact in the case is the condition of testatrix at the very time the will was executed. It is not sufficient to impeach the validity of the instrument merely to show that testatrix had cerebral hemorrhage in the front

part of the brain on the right side; that her mentality was to some extent weakened and impaired; that she had defective memory; that she was unable, upon all occasions, to recognize her acquaintances and friends; that she manifested some change from the quiet dignity and culture formerly observed, to an altered personality and an inclination toward facetiousness and, to some extent, indifference to the character of her speech and conversation.

"The test of mental capacity has been many times stated by this court. Testamentary capacity exists if the testator has sufficient mentality to understand the nature and purpose of the instrument about to be executed, to remember and possess sufficient capacity to know the extent and nature of his property; to know and comprehend the distribution which he desires to make thereof; and to remember and know those having claims upon his bounty. Capacity to transact business generally, to make contracts, and to carry on difficult negotiations are not essential to testamentary capacity. [Citing cases.]

"Mental weakness due to disease does not deprive one of testamentary capacity until it has progressed to the extent that the power of intelligent action has been destroyed. Mere forgetfulness and enfeeblement of the body are not alone sufficient to disqualify one from making a will. *The disqualification which deprives one of testamentary capacity must exist at the very time of the execution of the instrument. * * *.*" (Italics supplied.)

Although a detailed statement of the evidence cannot be presented perhaps it is advisable to state briefly certain facts relating to the execution of the will.

On February 6, 1939 Ellen B. Hayer went to the bank at Lamoni, Iowa, and consulted with Verne Deskin, a member of the Iowa bar and the cashier of that bank. On that occasion Mrs. Hayer inquired of the witness, Deskin, as to the making of a will for her and commented concerning a former will.or a copy thereof that she had with her. According to Mr. Deskin's testimony in referring to a portion of the former will that pertained to a bequest to Vera Redenbaugh, the decedent is quoted as saying, "I want that part changed that gives Vera Redenbaugh $5000 to $1000." Further inquiry was made as to other

portions of the old will and statements were made by Mrs. Hayer as to the manner in which she wished her property to be disposed of by a new will. In the old will which had been executed during the year 1930 she had made provision for the residue of her estate to go to the Latter Day Saints Church, after the payment of certain bequests, but in her conversation with Mr. Deskin relative to the new will, she told him, "I want the church left out." There was further conversation between Mrs. Hayer and Mr. Deskin relative to the deeding of the Wright County farm to an official of the Latter Day Saints Church, which deed had been executed September 12, 1930, and also concerning the earlier will executed in 1930. The decedent stated to the witness, Deskin, that Vera Redenbaugh had threatened to break the deed and will and that she wanted it fixed so she could not do it. In this conversation she stated who she wanted to witness her will and made arrangements to have these parties come to her home on the following day, February 7, 1939. On that date the witness, Deskin, came to the home of the decedent about five o'clock in the evening and there was present also at that time, Lucile Mader and Martin Hynden. These two persons signed the will as witnesses. Joe Danielson, the person named as executor in the will, was also present as was also Dolores Midgordon. This last-named person is a stenographer and had been asked by the witness, Deskin, to come to Mrs. Hayer's residence. Miss Midgordon took down in shorthand the conversations between the witness, Deskin, and the decedent relative to Mrs. Hayer's statements and wishes in connection with the will. This witness testified as to these facts. Counsel for contestant have criticized the manner in which this will was executed and the taking of the notes by the stenographer but it seems to us that this criticism is without justification. All of the witnesses present at the time of the signing of the will testified to the fact that Mrs. Hayer was of sound mind at that time.

Neighbors and acquaintances who had seen Mrs. Hayer about the time of the signing of her will and before and after that period also testified to her unimpaired mental faculties. Two other witnesses for the proponents testified as to seeing and

conversing with the decedent on February 7, 1939 and stated that in their opinion she was of sound mind on that date.

The contestant in support of her claim as to the unsoundness of mind of the decedent presented several witnesses. One of these was a lady who had been employed in the Hayer home to assist Mrs. Hayer at different times. This witness, Mrs. Grant Wise, testified that she was in the Hayer home something like two weeks in 1937, not to exceed eight days in 1938, and about eleven days prior to February 2, 1939. She testified as to certain eccentricities of the decedent and stated that Mrs. Hayer imagined that people were stealing from her. She also testified that Mrs. Hayer made reference to her deceased husband and that she wanted to see him and when some comment was made concerning Vera Redenbaugh, the contestant, the decedent according to Mrs. Wise's testimony stated, ''Who is Vera? I don't know Vera.'' This testimony was refuted by various witnesses who stated that Mrs. Hayer never so expressed herself to them concerning her deceased husband or the contestant. The witness, Mrs. Grant Wise, testified that in her opinion Mrs. Hayer was a person of unsound mind on February 2, 1939 when she left decedent's home. She was later employed during that year and further testified that in her opinion the decedent was of unsound mind after the 2d of February, 1939. Three nurses who were called to assist in the care of Mrs. Hayer at different times from and after September 1939 testified that in their opinion Mrs. Hayer, at the time of their observations, was of unsound mind. The witness, Otis Lysinger, was an assessor in Lamoni. He painted decedent's home in July 1939 and testified that during the time he was painting the house Mrs. Hayer made inquiry of him and said, ''Have you seen anything of C. F. around here this morning?'' This witness testified that the initials referred to, were those of decedent's husband who had then been dead about eleven years. This witness on cross-examination testified that in discussing the matter of painting the house Mrs. Hayer seemed to be able to carry on an intelligent conversation; that she seemed to know what she wanted done and stated that he thought she had always been strong-minded and a woman of decisive opinions. Fred Lysinger, a witness for the contestant, also testified as to

a conversation with the decedent wherein he stated that Mrs. Hayer referred to her deceased husband and said, "She wished C. F. would come home and tend to business." He also testified that he was at the Hayer home on February 10, 1939 when he went there to see about the fire and to inquire as to whether Mrs. Hayer was warm. At that time, according to this witness, Mrs. Hayer said, "Never mind the fire. C. F. will be back after a while to take care of it." It was this witness's opinion that Mrs. Hayer was of unsound mind on February 10, 1939.

The contestant, Vera Hayer Redenbaugh, testified as to various facts bearing upon the claimed unsoundness of mind of the decedent, as also did her husband, Lewis Redenbaugh.

It is entirely beyond the realm of possibility to set out all the facts presented in this case but the entire record has been read with care by this court as well as the numerous exhibits that have been presented. Consideration has been given to the medical testimony presented. The contestant called as a witness Dr. H. E. Stroy, who was the only doctor who testified in her behalf. It is shown that he was called as a consulting physician and saw the decedent on January 18, 1940 and observed her on that day for about forty-five minutes or an hour. It was his opinion that the decedent was suffering from arteriosclerosis and stated that it was a progressive disease which would and had affected her mentality and that in his opinion the decedent was of unsound mind on February 7, 1939. In connection with Dr. Stroy's testimony we can well give consideration to the case of Byrne v. Byrne, 186 Iowa 345, 365, 172 N. W. 655, 662, where the contestant sought to prove mental incapacity by the testimony of a doctor who observed the testator subsequent to the date of the execution of the will. In that case this court stated:

"The testimony of Dr. Walker alone is not enough to raise a jury issue upon this question. In the first place, while he is quite positive that, when he saw Byrne three years after the making of the will, the testator was suffering from paresis and senile dementia, and states as his judgment that the process of deterioration must have covered a period of five to ten years, he does not say, and in the very nature of the case, as he states

it, it is impossible for him to say, to what extent that loss of mental power had reached at the date of the will, three years before he ever saw the man. He tells us, as do all the other expert witnesses—as, indeed, we know from common observation and knowledge—that the mental decay attending these diseases is ordinarily of slow development, and, while progressive in character and incurable, its progress is at times remitted or suspended for indefinite periods; and that men sometimes continue in business for several years, without any marked exhibition of mental incompetence, before the deterioration results in complete incapacity. Such being an admitted truth, it is, as just said, impossible that Dr. Walker should be able to say that, on March 1, 1913, Matthew Byrne did not have mind enough to know the nature and extent of his estate, or to appreciate the claims, if any, of his children upon his bounty, or to make an intelligent devise of his property to the very persons whom he desired to receive it.

"We have, time and again, held that mental weakness or decay will not invalidate a will, until it has reached that stage which deprives the testator of capacity for intelligent action. Dr. Walker's testimony indicates the view that, in the scientific sense of the term, a man is insane from the instant when the brain tissue begins to deteriorate. Without attempting to debate that proposition with the witness, it is enough to say that the law recognizes no degree of mental decay as sufficient to deprive the person of testamentary capacity which does not deprive him of intelligent comprehension of the estate he is devising, or of his capacity to appreciate the nature and effect of the distribution he makes of such estate. His memory may be impaired; he may lack the mental qualities or alertness of youth; he may not be able to transact business generally, or to enter into complicated contracts; and still be able to make a valid will. Bearing these propositions in mind, it becomes apparent that Dr. Walker's opinion is insufficient to supply the lack of material support for the verdict which the record otherwise discloses."

On behalf of the proponents, Dr. M. O. E. Gamet, who had attended Mrs. Hayer for several years, was called as a witness. He had attended her on numerous occasions before and after

the will was executed. He testified that he saw her on January 14, 1939 and again on February 18, 1939 in his office and that she came in each time and got some medicine and as far as he could remember she. was perfectly alright. He stated he did not recall that she was abnormal mentally at these times. She next came to his office on June 10, 1939 for some medicine. He saw her several times during the summer. Doctor Gamet stated that in his opinion Mrs. Hayer was of sound mind from January 10, 1937 when he first was consulted by her until September 1939. It was his further opinion that the decedent was of sound mind on February 7, 1939.

As a matter for further consideration, and as bearing upon decedent's mental capacity, there was admitted in evidence a letter written by Mrs. Hayer, dated February 12, 1939, and which is as follows:

Lamoni Iowa Feb. 12-39

Dear Sister Jennie:—I certainly appreciate your letter am glad your feeling quite well, does the pain compare with the pain you suffered when the children were born?

I think H—— got to Missoula at time he figured he would but that severe cold spell reached Missou before it struck us here and the man he had engaged wasn't there to meet him and Lyda wouldn't let him go in the severe cold spell. I had a short letter from him Mon. of this week saying he found everything at home all right.

Mentioned Maurice and his near neighbor sawing and packing ice, but I think H's ice house was full before he came.

I found a card written by Mary Jones 4½ years ago If Mary had been with E S—— all the time Esthers will would read quite differently than it did. You see she called those outsiders bloodsuckers. She mentioned 2 women that came out from Chicago they didnt come together one wanted E. to remember her son the other her nephew, there very likely a lot came from various places but Mary didn't happen to see them.

They say Lamoni is full of flue cases and some small pox cases a woman that just returned from hospital with new born babe has small pox and several other cases they say but I havent learned names.

Hope to hear from you soon. Yes I rec a card but not till after H left.

Good Bye E. B. H.

Upon the whole record, having in mind the rules which have been set out for our guidance, we are firmly of the opinion that there was not sufficient evidence presented to raise a jury question and that the trial court was in error in not directing a verdict for the proponents at the close of all the evidence. We are mindful of the testimony of Mrs. Grant Wise and Fred Lysinger, witnesses for the contestant who testified as to facts and circumstances bearing upon Mrs. Hayer's mental capacity on or about the time of the execution of the will in question. However, it appears to us that the very positive and uncontradicted testimony relative to the facts and circumstances at the very time of the execution of the will are so controlling that even when we consider contestant's testimony in its most favorable light we cannot say that the contestant has made out a case for the jury as to Mrs. Hayer's mental incapacity to make a will on the day she executed her purported will. We have given careful consideration to the cases cited by the contestant. The facts in these cases are different from the facts in this case.

Our conclusions as to the question of the mental capacity of the decedent to execute a valid will make it unnecessary for us to pass upon other questions that have been raised in this appeal. It is our conclusion that this case should be reversed.—Reversed.

MILLER, C. J., and BLISS and SAGER, JJ., concur.

HALE, J., concurs in the result.

GARFIELD and OLIVER, JJ., dissent.