JEAN GILLETTE et al., appellants, v. EMIL Y. CABLE, appellee.

No. 48972.

(Reported in 79 N.W.2d 195)

8

NOVEMBER 13, 1956.

Linnan & Lynch, of Algona, and James & Greer, of Spencer, for appellants.

Cornwall & Cornwall, of Spencer, and Loth & Melton, of Fort Dodge, for appellee.

SMITH, J.—The question of testamental competence comes to us here in reverse form and with unusual complications. But it remains, we think, the same old, familiar—and usually troublesome—problem.

On January 30, 1951, Grace Cable, then 65, and her husband, defendant Emil Y. Cable (73) executed a joint will. After giving everything to the survivor, they devised 160 acres of Dickinson County land to Donald Emil Cable, son of their adopted son, Kenneth Riley Cable (subject to certain conditions); and 240 acres in an adjoining section to the seventeen named plaintiffs ("the following named nieces and nephews"); also to the children of defendant's deceased brother Henry R. Cable, "the names * * * being to us now unknown." The named seventeen are all children of Mrs. Cable's brothers Lester and Roy Gillette and of her sister, Mrs. Opal Fuller.

The explanation of the inclusion of Mr. Cable's brother's children is found in his testimony. The Cables and Mr. and Mrs. Lester Gillette were starting the next day to drive to California. Defendant says the only talk he had before January 30, 1951, about a will was with Mrs. Cable's brother Lester. "Several times he said we should make a will before we went to California. * * * Mrs. Cable and I did not talk at home or anywhere else about what should be in the will."

He says Mr. Gillette and wife were at the Cable home and said "We will call at your house and have you go along down to the office to draw up the will." They (the Gillettes and Mrs. Cable) went to the lawyer's office at Spencer, in Clay County. "The next day * * * we all four went to Spencer." They did not talk about the will on the way. "I first found out what the will said when the four of us went into the office and Mr. Greer handed me the will. * * * It was all written up."

Defendant, after reading it carefully, said: "Lester's and Opal's and Roy's children are mentioned; now I have a brother with four children, not very well to do and I would like to have their names added." He could remember the nephew's name but not the names of the three nieces. The will was rewritten in the form in which executed. The next day they started for California in the Cable car. Mrs. Gillette denies she and her husband took

Mrs. Cable to the law office prior to January 30, 1951, and denies they were present when the joint will was signed.

The immediate events involved here occurred September 10, 1952, when Mr. and Mrs. Cable executed new, separate, but reciprocal wills ("hereby revoking any and all former wills") by which each gave everything to the other "absolutely." Mrs. Cable nominated defendant as executor without bond; he nominated her as executrix, with "my son Kenneth Cable" as alternate "if she is physically unable to qualify"—in either case without bond.

Plaintiffs question Mrs. Cable's competence to make this later will. They also claim undue influence by reason of confidential relation between husband and wife such as to cast on defendant the burden of proving Mrs. Cable was not under its influence. They appeal from the decree in defendant's favor. While this suit is essentially a "will contest" it is in equity and triable de novo on appeal, a matter to be kept in mind since so many of the authorities are jury cases.

Mrs. Cable died February 24, 1953, aged 68 years. She and defendant were married in 1915. They had no natural children but had, on December 21, 1935, adopted two boys, Kenneth Riley Cable (8) and Arthur Cable (12). Arthur is a carpenter. He farmed part of the land "for a year or two" but "married a girl from Philadelphia around April or May of 1944. Since his marriage, he has spent most of his time in the east." However, he had moved back at time of trial but seems not to have been called to testify. He was not mentioned in the joint will nor was Kenneth except as father of the devisee of 160 acres.

Kenneth lived on one of the farms involved here. The entire 400 acres stood in Grace's name. They had formerly owned 800 acres but had allowed the other 400 to go to clean up the mortgages during the hard times. "We kept her 400 acres because we were living on it and had done a lot of building there and it was more valuable and had less mortgage."

Mrs. Cable is quite universally described as having been a very intelligent, well-read woman, brilliant, above average. One witness (her sister-in-law) calls her "a dominant woman, a person of her own opinion who was not swayed by anyone." She had a Bachelor's Degree from Iowa State College and a Master's from Chicago University.

She was active in church and community affairs as well as being a competent homemaker and housekeeper and business-woman.

We are (naturally) not so well informed as to Mr. Cable. But the record abundantly describes him as kind and solicitous in caring for his wife in her later days of sickness and physical disability and infirmity.

I. There are doubtless other pertinent factual details which will emerge as we discuss the opinion evidence and the law applicable to the issues here. We observe first that the test of mental competency to make the second will (September 10, 1952) is not different on account of the then existing joint, mutual one of January 30, 1951.

We may assume the earlier (joint) will would have been sufficient to evidence (or result in) a contract for the benefit of third persons named therein as ultimate devisees and legatees, had either maker died and the survivor taken advantage of and accepted the provisions made in the joint will for him by the other. Only if and when that happens does a binding contract emerge in such cases, which third-party beneficiaries may enforce. Jennings v. McKeen, 245 Iowa 1206, 1210, 65 N.W.2d 207, and cases cited. In DeJong v. Huyser, 233 Iowa 1315, 1320, 11 N.W.2d 566, 569, we said: "We have held repeatedly that in a joint will there is a contractual relation *which becomes irrevocable after one of the testators dies and the other accepts benefits thereunder.*" (Emphasis supplied.)

The cases cited by plaintiffs are in no disagreement with the postulate that no binding contract exists so long as both parties live. Either may revoke. "But if there be no revocation before the death of one of the parties, the right of the survivor is thereby fixed * * * according to the terms of the mutual will." Anderson v. Anderson, 181 Iowa 578, 584, 164 N.W. 1042, 1044. "And where, as in the instant case, provision is made for third parties, the rights of such third parties are equally thereby fixed." Child v. Smith, 225 Iowa 1205, 1214, 282 N.W. 316, 321. Few propositions are better established in our opinions.

II. But plaintiffs argue: "In order to have the mental capacity to destroy, cancel and annul, the joint, mutual and reciprocal will * * * she would have to have more than the capacity

to make a new will. * * * If her mental capacity were not equal to make a new will, she could not cancel and annul the previous one."

We assume these two propositions are to be read together— the first modifying the second. So read we cannot approve the result, though the last sentence, standing alone, seems unobjectionable. But we find no logic for the intended contention that *greater* capacity is required to revoke a reciprocal will. There was no contract inter vivos that either party could not rescind in the lifetime of the other. Campbell v. Dunkelberger, 172 Iowa 385, 389, 153 N.W. 56; Anderson v. Anderson and Jennings v. McKeen, both supra; Luthy v. Seaburn, 242 Iowa 184, 46 N.W.2d 44. Nor was there any contract for third-party benefit. As appellee aptly states: "While both testators live, their joint will is ambulatory and revocable." Third-party beneficiaries have no right or interest that either testator may not disregard so long as both live.

We have read the authorities relied on by plaintiffs but find none that supports their thesis. Nor do we think it supported by reason.

III. Plaintiffs seem to argue that Mrs. Cable must have been competent *to contract* on September 10, 1952, in order to have had necessary mental competence to revoke the joint will of January 30, 1951. That there is a difference between competence to contract and competence to dispose of property by will is abundantly recognized in our decisions. Citation of authority seems almost unnecessary. See In re Estate of Ruedy, 245 Iowa 1307, 1315, 66 N.W.2d 387, citing Bishop v. Scharf, 214 Iowa 644, 653, 241 N.W. 3; Byrne v. Byrne, 186 Iowa 345, 172 N.W. 655; Womack v. Horsley, 178 Iowa 1079, 152 N.W. 65; In re Estate of Cooper, 200 Iowa 1180, 206 N.W. 95; In re Will of Kester, 183 Iowa 1336, 167 N.W. 614.

Plaintiffs' reasoning would logically require greater mental competence to revoke a mutual than an individual will in any case, at least where the mutual one contained provision for a third-person beneficiary. But the premise is unsound. So long as both testators live there is no irrevocable contract. We have not found, nor have plaintiffs cited, any authority for their con-

tention, or any consideration to suggest there *should* be such a decision.

Mutual wills are naturally resorted to only by persons closely bound by ties of relationship or of mutual friendship and interest. There is every reason for keeping them as readily revocable as are other wills. Plaintiffs' inability to support their argument by precedent is understandable as is their desire for its soundness in the instant case.

IV. The real issue here must be Mrs. Cable's competence to make *any* will on September 10, 1952. That is the principal if not the sole issue of fact that confronted the trial court and that confronts us.

The decision in In re Estate of Rogers, 242 Iowa 627, 630, 47 N.W.2d 818, 820, cited in both briefs, gives one of the latest statements of the test of testamentary capacity: The testator must (1) understand the nature of the instrument he is executing; (2) know and understand the nature and extent of his property; (3) remember the natural objects of his bounty; and (4) know the disposition he desires to make.

See also the still later case, In re Estate of Moeller, 247 Iowa 174, 182, 73 N.W.2d 15, 19; and In re Estate of Groen, 245 Iowa 634, 638, 62 N.W.2d 143, 145.

In an earlier case we emphasized that: "It is well settled in this state that physical weakness or infirmity, if proven, is not in itself sufficient to avoid the probate of a will, and mere mental weakness, not due to mental disease, until it has reached that stage which deprives the testator of capacity for intelligent action, does not constitute mental unsoundness such as to incapacitate him from making a will." Cookman v. Bateman, 210 Iowa 503, 504, 231 N.W. 301, 302, citing many cases.

V. The factual burden is of course on one who alleges lack of mental testamentary competence. And it is to be remembered the law is slow to deny the right of any person to dispose of his property by will as he sees fit. No mere impairment of his mental or physical powers is enough so long as he retains mind and comprehension sufficient to meet the tests we have itemized. In re Estate of Rogers, supra, 242 Iowa at pages 630, 631, citing In re Estate of Sinift, 233 Iowa 800, 810, 10 N.W.2d 550, and other cases.

 And in appraising the factual record one important rule of evidence must be remembered: "A nonexpert witness may testify to unsoundness of mind only after stating sufficient facts to support the conclusion." Neidermyer v. Neidermyer, 237 Iowa 685, 689, 690, 22 N.W.2d 346, 348; Ipsen v. Ruess, 239 Iowa 1376, 1379, 35 N.W.2d 82; In re Estate of Ransom, 244 Iowa 343, 358, 359, 57 N.W.2d 89; In re Estate of Heller, 233 Iowa 1356, 1363, 11 N.W.2d 586; Olson v. Olson, 242 Iowa 192, 204, 46 N.W.2d 1, 40 A. L. R.2d 1.

VI. We reach, at length, a discussion of the evidence bearing on Mrs. Cable's mental competence to make a will on September 10, 1952, when the parties executed mutual wills, purporting to revoke the joint will of January 30, 1951. Defendant suggests that issue may be by-passed by pointing out defendant's unquestioned concurrent right to revoke, which was exercised at the same time.

But that solution, if approved and adopted, would still leave undetermined the validity of Mrs. Cable's later disposition of the property standing in her name. It would at most leave a part of the problem unsolved. We therefore make no pronouncement on it and proceed to a consideration of the testimony adduced as to her mental condition on September 10, 1952.

 We shall try not to unduly extend the factual discussion. Were it a case triable at law we should, probably without hesitation, hold a jury question was presented. There is of course some conflict in evidence. But we have no doubt of the correctness of the trial court's decision.

We consider first the medical testimony. Two doctors were called by plaintiffs. It fairly appears Mrs. Cable's physical decline commenced, or was commencing, about the time the joint will was executed. Doctor Sahs of Iowa City, specializing in the "branch of medicine that is generally known as neurology", testified from his own contacts with the patient, but says "I based my observations * * * upon the general groundwork laid by Doctor Coffee" who first saw her in April of 1951.

Doctor Sahs was a witness for plaintiffs. His testimony may fairly be said to relate principally, if not wholly, to physical conditions. It seems Mrs. Cable was in the State University Hospital at Iowa City on various occasions during 1951 and

1952, and at some stage (apparently in September 1952) her condition was diagnosed as due to a malignant growth—"malignant lymphoma." He says "Increased intercranial pressure is a rare complication of this condition."

The testimony is replete with mention of speech difficulty by this time. "Stuperous (sic) with slurred heavy speech." But the witness steadfastly refused to testify to any mental involvement. "In a general way, and as I have observed this disease in others, I would say that in general the mentality remains good." And on cross-examination the doctor adds: "My note says she was co-operative and helpful." And the doctor further adds: "Her being asked questions and answering them correctly should be taken into consideration in determining her mental condition." This part of his testimony related to his own examination in September 1952, after the later wills were executed. But in response to every attempt by plaintiffs to elicit an opinion as to impairment of her mentality the answer was the same—"I cannot answer that question."

Plaintiffs' other medical witness, Doctor Fieselman, a general practitioner of Spencer, also testified from personal examination: "Grace G. Cable was a patient of mine. * * * I was first called to assist her on May 28, 1952." He says: "In May of 1952 she was very alert and seemed to be a very interesting woman, well educated, and could talk about anything in almost any field."

Most of his testimony refers to physical symptoms but on August 28 and September 5 he notes she would keep her eyes closed and did not have "the alert look * * * and interest in what was going on that she had in June"; she "was willing to let events take care of themselves * * * did not exhibit any disposition to think for herself. She was not aggressive."

His opinion is apparently not based on application of the legal tests or standards measuring testamentary capacity but on a comparison with her own earlier unusual alertness and aggressiveness. And when he was asked as to her being "mentally competent" (without specifying "to make a will") he replied: "I don't see how she could be competent to make a contract. I don't believe she was competent to make a disposition of her property", combining two quite dissimilar and unrelated prop-

ositions. See In re Estate of Ruedy, 245 Iowa 1307, 66 N.W.2d 387.

On cross-examination he admits "I never checked into her mental status at any time"; and also that "in the fall sometime" an attorney for plaintiffs admonished him "to remember her mental condition because he was going to contest this will." She died the following February.

The other doctor-witness was called by defendant and testified entirely upon a hypothetical question. "I have never seen Grace Cable." Doctor Rodawig maintained a hospital at Spirit Lake. He answered carefully that under the "conditions as outlined * * * I would be forced to state that this patient would be of sound mind."

Much of the lay testimony of mental unsoundness was unsupported by a detail of sufficient facts to render it helpful or even admissible. We have already commented on the rule of evidence requiring such foundation. Much was based on Mrs. Cable's later apathy as compared with her earlier alertness—conduct and appearance due to physical deterioration, not necessarily indicative of mental decline. Inevitably, the strongest came from witnesses prejudiced, perhaps unconsciously, by family ties. We are speaking dispassionately, not critically. They reveal not merely their own family preference but insist on Mrs. Cable's family loyalty as well.

The testimony on the other side poses some factual disputes due probably to variance in Mrs. Cable's condition from day to day. The attorney who drew the later wills and the witnesses who attested them have of course the advantage of speaking as to her appearance and conduct at the moment the wills were executed. They saw nothing to suggest unsoundness of mind.

The young Spirit Lake attorney first met Mrs. Cable at the Cable home August 29, 1952. He had to depend on her sister, Mrs. Fuller, as to what she said: "The words were jumbled together and I could not understand." Mrs. Fuller told him she said "she didn't want trouble" or it might have been "Certainly no one likes trouble." The witness says "I think Mrs. Fuller was advocating that I should prepare a will."

On September 10 he came with his typewriter and drew the wills. Mrs. Fuller had gone. He invited both witnesses into the

room—Mrs. Wittrock who was acting as a sort of domestic or practical nurse in the household, and Mrs. Morisky, a neighbor. Mrs. Wittrock, who did not know Mrs. Cable prior to August 29, describes her difficulty in speech and her patience in helping the listener to understand. "When I would question her, 'Do you mean this or that?' she would shake her head yes or no, and finally we would come to an understanding."

Mrs. Wittrock also says she "seemed normal to me." When asked directly she replied, "She (Mrs. Cable) never drawed my attention either way." There is much to her testimony descriptive of Mrs. Cable; and her conclusion was that Mrs. Cable was of sound mind. Referring to the conversation after the wills were signed she says: "Mr. Narey (the attorney) asked what E.Y. (defendant) would do with it after she died, and she said 'Well, that will be E.Y.'s worry.'"

Mrs. Morisky had known Mrs. Cable "many years", had visited her two or three times during the month prior to September 10. "She would call me by my right name. * * * She had difficulty in speaking. At times she said she was glad I had come, and to come again."

This witness gives a very definite account of Mrs. Cable's participation in preparation and execution of the will. Asked about the former will, she told the attorney that "it wasn't suitable." Asked how much property she had she replied "Five eightys." Asked to whom she wanted it to go she said "E.Y." Asked as to her family she said she "didn't have any, but had two adopted boys." She told where they lived and "that E.Y. was to worry about the property after his death."

The witness says Mr. Cable took no part in the conversation between her and the attorney and that no one helped her with her answers; that she talked about her grandchildren. "She asked us by name to be her witnesses."

The attorney's testimony fully corroborates that of the two witnesses as to all pertinent details. He testifies he asked Mrs. Cable "do you want it to go to somebody else after * * * his life is over * * *?" to which she replied "'E.Y. will have to worry about that.'"

There is much more by other witnesses with less opportunity to observe but we have already gone into too much detail. We

18

can only repeat we think the decision of the trial court is right—that under the record any other conclusion would be unthinkable.

Strangely, the absence of provision for the adopted sons receives little comment in the record. Both were easily within the description: "natural objects" of Mr. and Mrs. Cable's bounty. There is reasonable ground for suspecting that problem was one reason that appealed to both defendant and his wife for revoking the joint will.

VII. It is sufficient here however that we find no evidence in the record that would justify a reversal. We have paid scant attention however to the pleaded issue of undue influence. Perhaps it should receive a word.

 *Undue* influence means something more than and different from the natural, wholesome relationship between wife and husband concerning their mutual interests. The influence growing out of such relation is manifestly not ordinarily "undue" or improper. "Undue influence" implies *dominance* of which there is no slightest evidence here. We have held that the rule of confidential relationship shifting the burden of proof does not apply in testamentary affairs with the same strictness as in cases involving gifts inter vivos. In re Estate of Rogers, supra, 242 Iowa 627, 635, 47 N.W.2d 818, and cases cited. See 94 C.J.S., Wills, section 230b; Perkins v. Perkins, 116 Iowa 253, 261, 262, 90 N.W. 55.

The Texas court has pertinently stated in a case involving the marital relation: "There is an influence which a wife, by her virtues, her love, and her sacrifices, gains over her husband's affections and conduct, whereby he may be caused to make a will in her favor, which cannot be considered as and must not be taken for undue influence. Ater v. Moore (Tex. Civ. App.) 231 S.W. 459. * * * As between husband and wife, the influence exerted, in order to defeat the probate of a will, must go beyond legitimate argument, legitimate persuasion, and amount to domination or coercion." Craycroft v. Crawford (Tex. Civ. App., 1925) 275 S.W. 124, 126.

See along the same line Hamlett v. McMillin (Sup. Ct. Mo., 1920) 223 S.W. 1069, 1074.

We have no doubt of the sufficiency of this record to answer any charge of undue influence against defendant. The decision of the trial court must be and is affirmed.—Affirmed.

All JUSTICES concur.