### In the Matter of the ESTATE of Addie E. FARIS, Deceased.

#### No. 53018.

Supreme Court of Iowa.

June 11, 1968.

Whitesell Law Firm, Iowa Falls, for appellants Everett and Edna Lyman.

Lundy, Butler, Wilson & Hall, Eldora, for appellee, Gladys L. Worrell.

SNELL, Justice.

This is a proceeding in probate tried as in equity. The controversy arose over the administratrix' petition to sell real estate free and clear of a 5-year lease between decedent and appellants-lessees.

Addie E. Faris, age 84, a widow without issue owned the 220-acre farm involved herein and 5 other parcels of real estate of lesser value. She died intestate. The probate inventory in her estate listed property appraised at over $108,000, including substantial bank accounts and personal property.

She was survived by two elderly sisters and a brother.

On November 17, 1966 Mrs. Faris entered into a 5-year lease of her farm with Everett and Edna Lyman. On February 7, 1967 Mrs. Faris while walking across the road to her mailbox was struck by a car and killed. Her administratrix sought cancellation of the 5-year lease on several grounds. The trial court found that decedent's incompetency had been proved by clear, satisfactory and convincing evidence and set aside the lease. The court also found that the lessees' counterclaim had not been substantiated.

The lessees appealed.

The printed record on appeal contains over 400 pages. Far too much of the record consists of testimony in question and answer form. It is not abstracted as required by rule 340, Rules of Civil Procedure. It continues a time-consuming pattern that caused the trial court to comment, "It's getting awfully tedious under this cross examination."

Appellants emphasize and reemphasize that to understand the crucial fact it is absolutely necessary that we read the entire record. Such is our custom and we have done so here.

The administratrix called 18 witnesses plus 1 in rebuttal. They included 2 doctors, a registered nurse and a nurse's aid who had attended decedent, decedent's sister, 2 farm neighbors, a deputy sheriff, county auditor, county treasurer, 3 bank officers, a real estate broker and other business people who knew and had done business with decedent. The lessees called 8 witnesses.

No useful purpose would be served by detailed discussion of the testimony of the many witnesses.

■ The trial court's findings of fact are overwhelmingly supported by the record. We quote:

"For many years Addie E. Faris and her husband lived on a farm near New Providence, Iowa. She was neat about her person and household. They had no children. They lived for a few years in Eldora, Iowa. Mr. Faris died, and Mrs. Faris moved back to the farm several years ago. She owned several properties in Hardin County.

"As the years came on, Mrs. Faris became afflicted with arteriosclerosis, which became more marked with the passage of time as she passed through her late seventies and into her eighties. In recent years her case became quite pitiful and then actually deplorable.

"Mrs. Faris became atrocious about her personal hygiene. She did not wash, and had an unpleasant smell about her. The lines in her skin had old dirt in them. The area of her organs of excretion was so filthy as to be almost scabby.

"Her clothing went downhill similarly. It was old, ragged, dirty, and disreputable. She wore several items of clothing, such as sweaters, over each other.

"She became like a pack rat about collecting worthless items—papers, magazines,

old sewing machines, and numerous items of junk. She literally filled up one house in Eldora, and her farm house, with such items.

"She let her properties, like her person, go downhill. She did not paint or repair them, so that they fell into very poor condition.

"The rooms in the farm house where Mrs. Faris resided were full of junk, and she lived in the kitchen. She had an oil heater there, but ran only the pilot light, though she had substantial property. She wore many clothes. Litter filled the kitchen, as well as a very bad odor. She used a pail for a toilet, and did not keep it emptied. She used a hot plate for such cooking as she did, and slept behind the stove on a cot. The bed clothing consisted of gunny sacks, and the pillow was an old article of clothing filled with rags. The whole thing was very dirty, and the room was a boar's nest.

"As time went by, Mrs. Faris became more confused about her affairs and badly needed a conservator. But she was one of those extremely independent old persons who would not hear of any such thing, and was irrationally suspicious of those who would otherwise have helped her. Unfortunately, she had no children to come forward and take charge, as in the usual case of persons in extreme senility. Other persons disliked taking on the burden of asserting a contested conservatorship. She came to sing dirty songs, to curse, and to associate with disreputable individuals, completely out of character with her normal years.

. "For several years Mrs. Faris had her farm in soil bank, and then Everett and Edna Lyman began to operate it. Lymans operated another farm in the neighborhood, on the customary year to year basis. Mrs. Faris' attorney lived in Eldora, but Lymans were acquainted with an attorney at Alden in another part of the county, and took Mrs. Faris there. The Alden attorney knew nothing of Mrs. Faris' past connections with the Eldora attorney, or of her background. Mrs. Faris executed a three-year lease on the farm to Lymans, from 1965 to 1968.

"By this time Mrs. Faris was losing her grip to the place that various individuals were importuning her for money and taking advantage of her. Two practicing physicians of wide experience—one a medical and the other an osteopathic physician—observed her and regarded her mentally incompetent.

"The pressure by farm tenants for land is great, and Lymans decided to get a longer lease from Mrs. Faris. So while their existing lease still had a year to run, on November 17, 1966, they again took Mrs. Faris to Alden, and this time they obtained a five-year lease—the one overlapping year plus four more, running to 1972.

"On February 2, 1967, Mrs. Faris was killed on the highway while crossing the road to her mailbox.

"Mrs. Faris left as her heirs two sisters and a brother, all elderly. Her estate was opened, the five-year lease was discovered, and Lymans were promptly informed that the lease was invalid because of Mrs. Faris' mental incompetency. Lymans desire to hold onto the lease, and in this proceeding to sell the farm (and the other realty) to settle the estate, they put Mrs. Faris' mental incapacity in issue."

Not mentioned by the trial court were several additional matters in support of the conclusion. We mention a few. While hospitalized for a short period some time before her death Mrs. Faris caused trouble and continued her unclean habits. She was a constant complainer at the sheriff's office. She wrote checks and then complained about them. Her checks "bounced", although she was rich. She bought groceries in large amounts from welfare recipients. She had 5 lockers at a locker plant with meat as old as 12 years stored therein. She bought a side of beef for her cats. At a business openhouse she

ate from 2 to 3 dozen doughnuts. She bought firearms "so people couldn't shoot other people." She had a building roofed from the top down contrary to customary building methods.

Opinions of incompetency were expressed. They were based on actual observations and proper foundations were laid.

Reputable witnesses who knew decedent were called by the lessees. They expressed opinions that she knew what she was doing but we agree with the trial court that Mrs. Faris' incompetency was established by clear, satisfactory and convincing evidence.

■ I. In equity cases, especially when considering the credibility of witnesses, we give weight to the fact findings of the trial court, but are not bound by them. Rule 344(f), par. 7, Rules of Civil Procedure. Here we have reviewed the record and exhibits de novo and are in accord with the trial court.

■ II. The test here is not testamentary capacity. A higher degree of mental competence is required for the transaction of ordinary business and the making of contracts than is necessary for testamentary disposition of property. Bishop v. Scharf, 214 Iowa 644, 653, 241 N.W. 3; 94 C.J.S. Wills § 15 d(3); In re Estate of Van Dyke, 245 Iowa 942, 948, 65 N.W.2d 63; Gillette v. Cable, 248 Iowa 7, 12, 79 N.W.2d 195; In re Estate of Ruedy, 245 Iowa 1307, 1315, 66 N.W.2d 387.

■ III. To avoid the farm lease made by decedent it was necessary to show not only that Mrs. Faris was of unsound mind when it was made but that she had no reasonable perception of the nature and terms of the contract. The question is whether decedent had sufficient mental capacity to understand the contract she executed. Urbain v. Speak, 258 Iowa 584, 590, 139 N.W.2d 311 and cases cited therein.

In 17 C.J.S. Contracts, § 133(1)a, this appears:

"Where one of the parties, for any reason, is incapable of understanding the force and effect of the alleged agreement, there is no contract; but mere mental weakness falling short of such incapacity will not invalidate a contract.

"It is essential to the validity of a contract that the parties thereto possess not only the legal status affording capacity to contract, * * * but also the mental competence affording capacity to consent. The rule which has been said to be well stated in Corpus Juris Secundum is that to make a valid contract, each party must be of sufficient mental capacity to appreciate the effect of what he is doing, and must also be able to exercise his will with reference thereto. A court of equity guards with jealous care all contracts with persons of unsound mind. In this connection, it has been said that 'insanity' and 'incompetence' are words of vague and varying import."

In the case before us there was direct testimony and convincing evidence that Mrs. Faris did not understand and appreciate what she was doing.

■ IV. Two doctors who had attended decedent in her lifetime testified. Neither was a specialist in psychiatry but both were experienced in treating elderly patients and observing the aging process and mental deterioration. They testified that Mrs. Faris was incompetent to handle her business affairs.

Their testimony should be considered as expert testimony. In re Estate of Van Dyke, supra, 245 Iowa loc. cit. 945, 65 N.W.2d 63.

■ V. On February 17, 1967 the administratrix filed an application for the sale of the farm here involved. Before hearing thereon it was dismissed without prejudice. A new application in the same form and for the same purpose was filed June 2, 1967. Lessees claim that they incurred expense, were harassed, and dis-

rupted in their farming operations. They asked actual and punitive damages. We agree with the trial court that the counterclaim has not been established.

VI. We again advert to the conclusions of the trial court. We quote:

"The court has no question at all but what Mrs. Faris was mentally incompetent to enter into the lease. This lease was not a simple matter like buying a sack of groceries. It was an important business transaction which placed a lease of unusual duration upon her farm. Most leases are annual, so that rentals can be changed, arrangements can be altered, the freehold can be sold free and clear, and the tenant can be turned out if his performance proves unsatisfactory. Mrs. Faris was of such unsound mind that she was legally incompetent to enter into such a transaction.

"Lymans contend that the heirs have no equity. But the heirs stand in the shoes of Mrs. Faris. If she were here today challenging the lease through a convervator, she would prevail. Those who stand in her shoes likewise prevail.

"Lymans also contend that the scrivener of the lease is a careful and competent lawyer. There can be no question about that, nor can his integrity be challenged in any way. But the problem is that he was almost entirely unaware of the background. Mrs. Faris was brought to him from another part of the county. Had he been informed of the circumstances, as this court has now been informed, he would have done as he has done in other cases; refused to draw the lease and advised that a conservator be appointed.

"This is not merely a case of some arteriosclerosis and senility. All older people have some arteriosclerosis. But when the condition advances to the place that the person actually becomes of unsound mind, the capacity to enter into a legal transaction is involved. That is what we have here. This poor old soul needed help. She was so far advanced in the disease—the medical doctor called it 'severe arteriosclerosis and chronic brain syndrome, advanced'—that she was no longer of sound mind. Her incompetency has been proved by clear, satisfactory, and convincing evidence. The lease cannot stand.

"The administratrix' allegation of confidential relationship, shifting the burden of proof, has not been established, although Mrs. Faris probably did lean on Mr. Lyman some. Neither have the charges of actual fraud and undue influence been substantiated, although Mr. Lyman ought to have taken Mrs. Faris to her regular lawyer or at least to a lawyer who was familiar with the circumstances. He overreached her some in getting this unusual lease from her, at her age and in her condition. All of these circumstances are not grounds in themselves for setting aside the lease, but they are considered in connection with the charge of unsoundness of mind, which has been established.

"Lymans' counterclaim is predicated on a prior petition to sell which was dismissed without prejudice by the administratrix. Lymans say they prepared to defend that proceeding and were put to expense, but the administratrix acted maliciously in dismissing it and recommencing the present proceeding.

"After the prior petition was filed, it was assigned for trial, and the administratrix contended she needed time for discovery and to prepare. Consequently she dismissed, and later started over.

"The court does not approve in the administratrix' procedure, but the counterclaim cannot be sustained. The court knows of no legal principle which subjects a litigant to damages for commencing a civil proceeding and dismissing it, even if the action is frivolous. On top of that, the prior proceeding was not frivolous, as has now been seen. After the administratrix did conduct discovery and did prepare for trial—and the preparation on both sides was extensive and thorough—it appeared on full trial that the allegations of the

prior petition like those of the present petition are true. Moreover, no malice appears. The counterclaim is not substantiated."

We agree.

The case is

Affirmed.

All Justices concur.