**IN THE COURT OF APPEALS OF IOWA**

No. 18-1361
Filed August 21, 2019

**IN THE MATTER OF THE GUARDIANSHIP AND CONSERVATORSHIP OF MAGGIE JEAN LEWIS TURNER,**

**TIMOTHY LEWIS and KIMBERLY HAWKINS,**
    Petitioners-Appellants.
_____

Appeal from the Iowa District Court for Johnson County, Lars G. Anderson, Judge.

A ward's niece and nephew appeal the denial of their applications for guardianship and conservatorship and the appointment of the ward's long-time friends as guardians. **AFFIRMED.**

Magdalena Reese of Cooper, Goedicke, Reimer & Reese, P.C., West Des Moines, (until withdrawal) and Sarah E. Dewein of Cunningham & Kelso, P.L.L.C., Urbandale, for appellant Timothy Lewis.

Thomas E. Maxwell of Leff Law Firm, L.L.P., Iowa City, for appellant Kimberly Hawkins.

Timothy J. Krumm and Stephanie A. Worrell of Meardon, Sueppel & Downer, P.L.C., Iowa City, for appellees.

Considered by Vaitheswaran, P.J., and Tabor and May, JJ.

**TABOR, Judge.**

Jean Turner is an extraordinary woman. Her family and friends agree on that point. Witnesses described the retired school teacher as intelligent, strong, sophisticated, and classy, but also as stern, demanding, stubborn, and private. Now eighty-five years old, Jean has dementia. And her extended family and long-time friends disagree on who should assist with her affairs.

In 2013, Jean granted durable medical power of attorney (POA) to her friends, Marian and David Coleman, and general POA for financial matters to Hills Bank and Trust Company. But Jean's niece and nephew believe she lacked the capacity to execute those powers of attorney and family is better suited to tend to her needs and protect her assets. Disagreeing with the niece and nephew, the district court appointed the Colemans as Jean's guardians. The court also declined to appoint a conservator. Finding no error in those rulings, we affirm.

## I. Facts and Prior Proceedings

Maggie Jean Lewis Turner was born and raised in Greensboro, North Carolina, where most of her extended family still lives. In 1972, Jean and her husband, Darwin, moved to Iowa where Darwin was an English professor and head of the Afro-American Studies Department at the University of Iowa. Jean worked as an elementary school teacher and retired in 1998. Jean met Marian Coleman when they both taught in the Iowa City Community School District. As teachers and "university wives," they grew close and remained life-long friends. Jean also enjoyed a warm friendship with David Coleman. The two often talked about gardening and politics.

Nearly every year after she left North Carolina, Jean made summer and Christmas sojourns back to Greensboro. Her nephew, Timothy Lewis, and her niece, Kimberly Hawkins, recalled those visits as a memorable part of their childhoods. They enjoyed spending time with their aunt. The family believed Jean intended to move back to North Carolina permanently. But Jean made her last trip to Greensboro in 2009. Timothy and Kimberly testified they maintained contact with Jean over the phone and by writing cards and letters. Kimberly still lives in a suburb of Greensboro. Timothy has lived in Baltimore for the last ten years.

After Darwin's death in 1991, Jean stayed in her own home but increasingly relied on the Colemans for help in her daily activities. She also relied on her son, Frenise Rachon Fulton (who went by the nickname Scrappy). But Scrappy did not live in Iowa and generally allowed the Colemans to handle Jean's affairs.

Starting in 2009, family members noticed changes in Jean. She spoke with long pauses, repeated herself, carried on "bizarre" and rambling conversations, and had memory lapses. She had always been slim and petite but seemed to have lost weight. Although family members discussed Jean's decline and tried to get in touch with Scrappy, they took no additional steps to address their concerns until years later.

In summer 2011, Jean met with attorney Matthew Hayek to discuss financial matters she had neglected, including unpaid taxes. Hayek knew Jean "had an array of financial holdings . . . and was in need of some help consolidating them and handling them." Hayek connected Jean with an accountant and tax preparer, as well as elder services. With Hayek's assistance, Jean executed documents granting powers of attorney to Scrappy and Clarence Skog, a close friend—who

provided her financial services. Hayek also helped Jean execute a living will and granted durable medical power of attorney to Scrappy.

Jean's situation shifted two years later when Scrappy died. Jean's sister, Frances, and niece Kimberly were the only members of Jean's family to attend the funeral in October 2013. When they arrived in Iowa City, Frances and Kimberly felt Jean "did not seem to understand the gravity of the situation." Uncharacteristically, Jean's hair and clothing were dirty, and her house was unsanitary and in disarray with unopened mail piled in boxes. The family tried to discuss the situation with the Colemans. But the Colemans said the power of attorney was handling her care. The family could not determine who held Jean's powers of attorney.

A month after Scrappy's funeral, Jean once again met with Hayek to discuss her estate planning. Hayek helped her execute a will; a durable medical power of attorney, designating the Colemans; and a durable general power of attorney, designating Hills Bank. When Jean met with Hayek on November 14 to sign the documents, the attorney was aware of her declining cognitive abilities and asked his staff serving as witnesses to be "very watchful" for potential capacity issues. Seeing none, Hayek went through the documents with Jean that he drafted based on her consistent instructions and helped her execute them.

In 2014, Jean received a diagnosis of dementia. When she was no longer able to live in her own home, the Colemans helped her move into a retirement community with a memory-care unit. The facility's director described Jean as an active member of the community—doing floral arrangements, baking club, and sing-alongs—though she is in the "later stages of dementia."

In 2016, Timothy and Kimberly petitioned for appointment of a guardian and a conservator for Jean. The family asked the court to appoint Timothy as conservator and Kimberly as guardian. As a threshold issue, Timothy and Kimberly asserted Jean's powers of attorney were invalid because she lacked the capacity to execute them in November 2013. The Colemans and Hills Bank sought to intervene. The Colemans asked the court to appoint them as Jean's guardians. They also argued Hills Bank was adequately managing Jean's finances and a conservator was unnecessary.

The court tried the matter in April 2017. In a detailed ruling, the court denied the family's petition. It determined the powers of attorney were valid and appointed the Colemans as guardians. Timothy and Kimberly appeal this decision.

## II. Scope and Standards of Review

Litigants try actions for the involuntary appointment of guardians and conservators at law. *See* Iowa Code § 633.33 (2016). Thus, we review for the correction of legal error. *See* Iowa R. App. P. 6.907; *In re Conservatorship of Deremiah*, 477 N.W.2d 691, 692 (Iowa Ct. App. 1991). We are bound by the findings of fact if supported by substantial evidence. Iowa R. App. P. 6.904(3)(a). Substantial evidence exists if we may reasonably infer the finding from the record. *Deremiah*, 477 N.W.2d at 693.

We also review the contractual issue about the capacity to execute the powers of attorney for errors at law. *See Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 178–79 (Iowa 2010).

As for the selection of a guardian, the district court has discretion to decide who might best serve in that fiduciary capacity. *See In re Guardianship &*

*Conservatorship of Reed*, 468 N.W.2d 819, 822–23 (Iowa 1991). We will not interfere in that selection unless the challenger shows a clear abuse of discretion in making the appointment. *Arent v. Arent*, 32 N.W.2d 660, 661 (Iowa 1948).

## III. Analysis

The parties agree Jean now needs a guardian. They part ways on three other questions: (1) whether she was competent when she executed the powers of attorney, (2) who would best serve her interests as guardian, and (3) whether she needs a conservator. We will address those questions in turn.

### A. Competency

Timothy and Kimberly contend the 2013 powers of attorney are invalid because Jean lacked the mental capacity to execute those documents. They fault attorney Hayek and the Colemans for allowing her to sign the documents despite knowing her declining cognitive abilities. They point to Hayek's precaution of alerting his staff to be mindful of Jean's mental state.

In addressing the family's contention, we start from the longstanding principle that a power of attorney is a contract. *See Farwell v. Carpenter*, 142 N.W. 227, 228 (Iowa 1913). "The first essential element of a contract is that the parties have the capacity to contract." *Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 25 (Iowa 1997). We cannot set aside a contract on grounds of incompetency "unless the evidence shows the person lacked sufficient mental capacity to understand it." *In re Guardianship of Collins*, 327 N.W.2d 230, 232 (Iowa 1982). The degree of mental competence required to enter a contract is higher than that necessary for disposing of property in will. *In re Estate of Faris*, 159 N.W.2d 417, 420 (Iowa 1968). And the burden is on the challenging parties,

here Timothy and Kimberly, to show by clear and convincing evidence that Jean lacked sufficient mental capacity when she executed the powers of attorney "to understand the import of her acts." *See Costello v. Costello*, 186 N.W.2d 651, 654 (Iowa 1971).

That burden was critical to the district court's decision. The court recognized Jean's cognitive ability had "significantly declined from her baseline." But the court did not believe Jean's family members offered clear and convincing evidence in support of her incapacity. For instance, neither Timothy nor Kimberly had contact with Jean when she signed the powers of attorney. In the court's view, the best available evidence was the credible testimony of Hayek and his staff members, who saw no signs of incapacity. The court also considered Jean's decision to designate the Colemans and Hills Bank to be reasonable, logical, and consistent with her long-term relationships with them. And the family did not counter that proof with any medical evidence of dementia from 2013.[1]

Hayek testified that when he first met Jean in 2011 to execute the original powers of attorney, he knew Jean was experiencing some cognitive decline and "was not at a hundred percent," but had no reason to believe she was incompetent. The condition of her home and her disorganized papers could be addressed with housekeeping and organizational assistance. He felt "she was an independent person who wanted to remain in her home and . . . she was capable of doing that with a little bit of help." His view did not change as he attended to her various legal matters for the next two years.

---

[1] A medical note dated July 2011 states she showed "short-term memory problems," but the record includes no significant follow-up.

In 2013, when Jean called him about the need to revise her estate planning following her son's death, Hayek discussed many issues with her, including Scrappy's estate. As a result of those conversations, Hayek drafted the living will and two powers of attorney. He had another phone call or two with Jean, and they met in his office on November 4 and again November 14 to execute the documents. Hayek testified during none of those interactions did he believe Jean lacked the mental capacity to execute the documents.

When they met on November 4, Hayek recalled nothing unusual about Jean's physical appearance. She was sad but "conversant." She asked questions and listened as Hayek explained the rules of intestacy without surviving parents, spouse, or issue. Hayek believed Jean understood the extent of her assets and how Hills Bank would manage them. He found her instructions to be fair, rational, and consistent between discussions. He also explained the powers of attorney and their effect. While discussing matters related to Scrappy's estate, Hayek believed Jean understood as much as any lay person would about probate proceedings, and he gained enough input from her to know how to proceed.

Hayek confirmed he has refused to oversee the execution of a will or power of attorney when concerned about a client's capacity or the possibility of undue influence. And because he was aware of Jean's cognitive decline, on November 14, he asked two staffers to attend the meeting. Hayek "wanted to be extra careful about the preparation of and the ultimate execution of those documents." But Jean recalled and understood the matters discussed ten days earlier. She still had a normal appearance and conversed as usual. Hayek probed for answers that allowed him to form the opinion she was competent. Once again

he concluded the powers of attorney reflected a deliberate choice, that she understood their effect, and that she was consistent about her desire to execute the documents and who was designated to act on her behalf. The two staffers in Hayek's office also recalled Jean showed no signs of incapacity. She carried on normal conversations with them. She appeared to understand the proceedings and what was being explained to her. The two staffers signed the will as witnesses. No one else was present at these meetings.

On appeal, the family assails Hayek's testimony as minimizing the deterioration of Jean's mental state. But Timothy and Kimberly were unable to offer evidence to refute Hayek's observations or those of his staff. Hayek is a seasoned attorney with seventeen years' experience in general family law. He testified he has prepared hundreds of wills and hundreds of power of attorney documents. He knew Jean over several years of legal representation. His caution in assessing Jean's capacity only reinforces his conclusion her decline did not render her incompetent. The district court found his testimony credible. We have no cause to question that finding. And given the lack of competing evidence from the family, we find no error in the district court's conclusion that Jean was competent to execute the powers of attorney.

## B. Guardianship

Timothy and Kimberly next contend the court should have found Kimberly a more appropriate guardian than the Colemans. They emphasize Jean's family relationships and strong ties to the Greensboro community, as well as their general understanding Jean wanted to return to North Carolina eventually. They also point

to the bond between Kimberly and Jean. They expressed their intent to move Jean to a similar memory-care facility in Greensboro so she can be closer to her family.

But the views of the family do not bind the district court when choosing a guardian for Jean. *See In re Guardianship and Conservatorship of Schmidt*, 401 N.W.2d 37, 39 (Iowa 1987); Iowa Code § 633.63(1). If two or more statutorily qualified and suitable persons are seeking guardianship of an adult ward, the district court must exercise its discretion to determine which proposed guardian's appointment would best serve the interests and well-being of the ward. *In re Guardianship of M.E.B.*, No. 06–0583, 2007 WL 1345895, at *5 (Iowa Ct. App. May 9, 2007).

The court found the Colemans best suited to be Jean's guardians because they are retired, in good health, and reside in the same city as Jean. The court highlighted four key considerations:

- First, the Colemans have been caring for Jean since long before the family got involved, are familiar with her medical history, and have a proven record of seeing to her needs with no expectation of compensation.

- Second, it is not in Jean's interests to move to North Carolina, particularly when routine and predictability are important to someone with dementia.

- Third, "[t]he appointment of the Colemans best comports with what Jean would have wanted. It was Jean's decision to appoint the Colemans."

- Finally, although the family believed Jean intended to return to Greensboro, she never made any move to do so, which suggests she wished to remain in Iowa City where she has lived for over four decades.

The Colemans, especially Marian, have maintained a close relationship with Jean since she moved to Iowa in 1972. They aided and cared for her for many years before the family began noticing a decline. Jean relied on them the way one would rely on family—everything from post-surgery care to funeral arrangements for her husband and son. They are familiar with her history and her health concerns. They have shown an ability to be an advocate for her at her nursing home. They continue to visit her weekly or take her out to eat.

On the other hand, Timothy, Kimberly, and the extended Greensboro family love Jean very much. But they have not been as present in her life as the Colemans. Before Scrappy's funeral, Kimberly had not seen Jean since her last visit to Greensboro in 2009. Timothy last saw her Christmas 2008. The family was unaware Jean had a heart attack in 2003 or underwent serious surgery in 2008.

Family members testified their contact with Jean was limited by her choice, that she guarded her business, and did not want the extended family involved in her private affairs. Given her penchant for privacy, we find it even more significant that Jean entrusted her care to the Colemans. Substantial evidence supports the district court's reasoning that the evidence of Jean's history and her choice of the Colemans as her powers of attorney signals her preference for them to serve as guardians.

We also find substantial evidence supports the district court's finding that had Jean wished to live in Greensboro, she would have moved following Darwin's death, her retirement, after the executing the powers of attorney, or after Scrappy's death. Because she did not, we agree she would not want to move now, even if

Kimberly could find a suitable facility and even if it would not disrupt Jean's routine and familiar environment.

Substantial evidence supports the district court's conclusion that the Colemans are best suited to monitor Jean's care and pursue her best interests going forward. We find no abuse of discretion in the court's appointment of the Colemans as Jean's guardians.

## C. Conservatorship

Finally, Timothy contends Hills Bank—as attorney-in-fact for financial matters—cannot meet Jean's needs. In Timothy's view, the court should have granted his application for conservator. Timothy argues the powers of attorney are limited and subject to revocation by the ward. He points to his education and background as well as his strong relationship with Jean as evidence he would make an appropriate conservator.[2]

Timothy bears the burden to prove by clear and convincing evidence the need to appoint a conservator. *See* Iowa Code §§ 633.551(1)-(2), 633.556(1). To meet the statutory requirements for appointment of a conservator, the evidence must show the proposed ward's "decision-making capacity is so impaired that the person is unable to make, communicate, or carry out important decisions concerning the person's financial affairs." *See id.* § 633.566(2)(a). The court must also consider the effect of third-party assistance in meeting the needs of the proposed ward. *Id.* § 633.551(4).[3]

---

[2] He has a business degree from Howard University and master's degrees from George Mason University and Johns Hopkins University.

[3] The district court held that assistance through a power of attorney constitutes third-party assistance. The family does not challenge that holding on appeal.

The district court found, "Jean's financial needs are being fully met and a conservator would not add to or enhance what Hills Bank is already able to provide." The court noted the family did not complain about how Hills Bank has handled Jean's financial affairs or describe how a conservator would help since Jean would no longer be competent to revoke the power of attorney.

Jean's relationship with Hills Bank goes back almost twenty years. Bank representatives responsible for Jean's accounts testified they pay her bills on time, file her taxes, keep track of her retirement accounts, receive and process her income and benefits, approve reimbursement receipts, and file quarterly reports or statements with attorney Hayek. A bank officer testified to approving reimbursement receipts for the Colemans for expenditures such as clothing items for Jean. He noted the Colemans do "an excellent job providing receipts and identification of specific items" for reimbursement. He also testified Jean's assets were complex and their management was time-consuming.

Timothy testified family inquiries into Jean's business affairs were met with suspicion and "push back." For that reason, he desired the court scrutiny of her finances that a conservatorship would bring. But he testified he only planned to act as conservator temporarily. Because he had no personal experience managing others' finances, Timothy intended to transfer the conservatorship to a finance professional in North Carolina.

Substantial evidence supports the district court's finding that Hills Bank is meeting Jean's needs by handling her financial affairs as power of attorney. We find no error in the court's conclusion it is unnecessary to appoint Timothy her conservator.

**AFFIRMED.**