# IN THE COURT OF APPEALS OF IOWA

No. 23-1202
Filed May 21, 2025

IN THE MATTER OF THE GUARDIANSHIP AND CONSERVATORSHIP OF MARY ZABEL,

JACQUELINE OBERHELMAN,
    Appellant.
_____

Appeal from the Iowa District Court for Webster County, Kurt J. Stoebe, Judge.

Following competing petitions requesting to be named their mother's guardian and conservator, the daughter who was not named guardian appeals. **AFFIRMED IN PART AND REVERSED IN PART.**

Cameron M. Sprecher of O'Mara & Sprecher, Mason City, for appellant Jacqueline Oberhelman.

David R. Johnson of The Johnson Law Firm, PLC, Eagle Grove, for appellee Shelly Zabel.

Brian L. Yung of Cochrane & Cochrane P.L.C., Fort Dodge, for appellee Mary S. Zabel.

Colin Hendricks, Fort Dodge, for conservator Green State Credit Union.

Considered without oral argument by Greer, P.J., Buller, J., and Potterfield, S.J.* Ahlers, J., takes no part.

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**POTTERFIELD, Senior Judge.**

Sisters Shelly Zabel and Jacqueline Oberhelman (Jackie) filed competing petitions to be named guardian and conservator of their mother, Mary Zabel, who has advanced dementia. Following a four-day trial, the district court selected Shelly to be guardian and Green State Credit Union to be the conservator; it suspended a 2012 durable medical power of attorney giving Jackie certain powers. Jackie appeals, challenging the court's guardianship decision and the suspension of the power of attorney.

**I. Background Facts and Proceedings.**

Shelly and Jackie filed competing petitions for the appointment of a guardian and conservator for Mary in May 2022. Each daughter proposed herself as guardian and conservator, and the district court consolidated the two cases. It was undisputed Mary was in need of assistance. A physician's report—completed by Mary's primary care provider—opined that she suffered from dementia without behavioral disturbance and was "substantially unable to care for [her] own financial affairs."

The attorney appointed for Mary asked for an emergency hearing to appoint a temporary guardian and conservator. The attorney stated that after personally interviewing Mary, it was clear that her "wishes [were] not reasonably ascertainable due to her medical condition" and that appointment of a temporary guardian and conservator were necessary. The court visitor and all parties were in agreement that an institutional conservator should be appointed temporarily. But they were unable to reach an agreement as to who should be the temporary guardian. And, while Mary's attorney recommended that she be moved into a residential care

facility, the sisters could not agree—Shelly thought Mary should be moved into a facility, while Jackie resisted it.

Before the emergency hearing took place, all parties agreed that Green State Credit Union would be appointed temporary conservator for Mary and Jackie would be appointed the temporary guardian. Mary was to be placed in a residential care facility that provided dementia care and could meet her needs. The court approved the settlement and ordered that Jackie had "no authority to place any restrictions on family members as [Mary's] visitors."

A four-day trial to the bench took place between March 7 and May 25, 2023. At trial, the parties introduced into evidence a 2012 durable power of attorney for health care decisions, in which Mary designated her now-deceased husband, Wayne, to make her health care decisions if she was unable and Jackie as Wayne's successor. There was no evidence at trial that Mary lacked competency in 2012.

The rest of the four days of trial focused on Mary's health in April 2022 and what happened after Mary's three daughters split into two camps—with Jackie in one and Shelly and their sister Barbara in the other. As the district court found[1]:

> Mary's mental status deteriorated after Wayne's death [in 2016]. The witnesses described Mary as struggling with the grief of the loss, but it became obvious by 2022 (and probably as early as 2019) that Mary's mental capacity was deteriorating. Mary continued to live in her home, but her daughters visited her daily, making sure that she took her medications, attended her medical appointments, and had food.
>
> Mary's situation had change[d] dramatically by April 27, 2022. Jackie and her ex-husband, Lyle Oberhelman (Lyle) took Mary to see their attorney, Jerry L. Schnurr, III, for the purpose of executing an Iowa Statutory Power of Attorney appointing Jackie as the agent.

---

[1] Substantial evidence in the record supports these fact findings.

Schnurr testified that he was satisfied with Mary's competence after meeting with her. Schnurr prepared the power of attorney[,] which appointed Jackie[,] and Mary signed it.

This was not the only significant event in Mary's life on April 27th.

Also on April 27th, Shelly took Mary to Green State Credit Union where Mary designated Shelly as the sole death beneficiary of her checking account. Shelly testified that most of the discussion with the Green State employee was with Shelly.

Mary was obviously struggling on April 27th. Jackie and Shelly both arranged separately for Mary to obtain medical treatment that day. The evidence depicts Mary's declining physical and mental health. In years previous, Mary had survived bouts with cancer and other physical challenges. These health events diminished Mary physically. The girls were devoting more time to her care and food preparation as each day passed.

On May 23rd, Schnurr drafted a Combined Petition for Appointment of Guardian and Conservator for Adult concerning Mary's at Jackie's request. The Petition alleged:

> The Respondent's decision-making capacity is so impaired that the Respondent is unable to make, communicate or carry out important decisions regarding the Respondent's financial affairs, and the Respondent is unable to care for her own safety or to provide for necessities such as food, shelter, clothing or medical care without which physical injury or illness may occur. The appointment of a Guardian and Conservator is in the Respondent's best interest. The Respondent has been diagnosed with dementia without behavioral disturbance.
>
> . . . .
>
> The Respondent has been diagnosed with dementia without behavioral disturbance. Cognitive testing by her physician indicates dementia range, without improvement in the future. She is able to do some activities of daily living with assistance but needs help with cognitive decision making . . . .

The April 27th to May 23rd period is also important because of the alignment of the daughters into opposing camps and their treatment of Mary. The three cared about Mary deeply and were engaged in her care as each daughter determined . . . Mary's best interests. However, these care plans conflicted and there was vehement disagreement about Mary's best interests.

Shelly and Barbara worked together. They increasingly provided 24-hour care. Initially, one would stay at Mary's home overnight. Eventually, Mary stayed in their homes. Jackie visited

and communicated with Mary frequently and monitored her medications.

Various factors militarized this tense situation. One of the primary reasons was animosity between Jackie's ex-husband, Lyle, and Shelly/Barbara.

It would be an understatement to say that there was great friction between Shelly/Barbara and Lyle. Lyle has a record of nine civil and criminal domestic abuse adjudications and violations of no-contact orders, harassment, and criminal mischief against Jackie between 2005 and 2012. Jackie and Lyle divorced. Lyle has numerous outstanding judgments.

On May 23, 2017, Mary purchased a home for Jackie at [address in] Fort Dodge (D Street). Mary has kept this home in her name and Jackie has lived there until she reunited with Lyle and moved into the home which he occupies. D Street has been vacant for some time.

There have been numerous confrontations between Shelly/Barbara and Lyle. Shelly/Barbara are concerned for Jackie's safety. They believe that Lyle manipulates Jackie and Mary, as demonstrated by numerous payments to him and on his behalf.

During April-May, 2022, Barbara and Shelly were Mary's primary caretakers. Jackie has accused them of restricting her access to Mary. Barbara and Shelly deny this and point to emails, telephone calls, and personal visits between Jackie and Barbara, Shelly and Mary. Mary expressed fear of Lyle to Barbara and Shelly.

May 21st proved to be another watershed day for Mary. Jackie requested to take Mary. Mary objected to Shelly and Barbara, but ultimately agreed to go in order to protect Shelly and Barbara from Lyle's wrath[.] Lyle and Jackie took Mary. Jackie refused to tell Shelly or Barbara where they were taking Mary or when she would be back. Ultimately, Lyle and Jackie took Mary to their home and ceased all communications with Shelly and Barbara.

. . . .

Jackie refused to allow any contact between Mary and Shelly/Barbara after May 21st. Jackie and Lyle kept Mary in their home. On June 17th, Mary wrote Check 5373 to Jackie in the amount of $2,221.00 for the delinquent property taxes on the home which Lyle occupies and there was a "disbursement" from her account of $5,000.00.

Shelly and Barbara made repeated requests to visit with Mary which were unanswered. Jackie requested the assistance of the Fort Dodge Police Department in response to these requests. Officer Matthew Meyer spoke with Lyle, Jackie, and Mary. He testified that Lyle was assertive and aggressive. He described Jackie as reasonable and Mary as "okay" but "disheveled." Meyer heard the allegations of harassment and contacted Shelly. He described Shelly as receptive when he warned her that she should stop all

attempts at contact or she could be charged with harassment. Shelly and Barbara stopped their attempted communications.

Attorney Schnurr emailed Shelly's attorney on June 14, setting forth the terms for a personal visit between Shelly/Barbara and Mary.

Dave,

This is a follow-up to our recent telephone conversation. As we discussed, one of the issues raised by your clients relates to the validity of the power of attorney I prepared and notarized for Mary. I will likely be a witness. Therefore, I think it would be best if I withdrew as attorney. I have visited with Brandy Lundy and I believe she will be able to represent Jackie going forward. Assuming this works, we will have Brandy file an appearance soon, and I will file a Motion to Withdraw. I have a call in to Brian Yung for him to contact Jackie and set up a time to visit Mary as Mary's attorney.

I have visited with Jackie. We can have Shelly and Barbara see Mary tomorrow, June 15 at 7:30 p.m. Only Shelly and Barbara are permitted to come. This will take place at Jackie's home. There will be no recording of any part of the visit. Lyle will not be in the house. Their son, Matt, will be present. The visitation will end no later than 9:00 p.m.

Matthew Oberhelman (Matt), who is Jackie's son, testified that he consented to supervise the visit. The visit began as planned, but within short order, Matt objected to some of the questions which Shelly and Barbara asked. This led to an argument and a premature termination of the visit.

[Mary's attorney's] Application for an Emergency Hearing Regarding Appointment of Temporary Conservator and Guardian was scheduled for June 25th. The parties agreed to the appointment of a temporary conservator and a temporary guardian as well as Mary's placement. . . .

. . . .

Eventually, Jackie placed Mary at Friendship Haven. This has been an extremely beneficial placement for Mary. Her physical health has improved dramatically. She has adapted well to the facility. Family members visit frequently. Shelly and Barbara are concerned that Lyle also visits and they suspect that he visits Mary alone. The three girls and Lyle take Mary out for lunch and short home visits.

The district court appointed Shelly as guardian rather than Jackie; the court concluded the 2022 power of attorney (which nominated Jackie if Mary was in need of a guardian) was invalid because Mary lacked the capacity to enter into a contract on April 27, 2022. And it found that Jackie's action of keeping Mary away from Shelly and Barbara was not in Mary's best interests and "was baseless and punitive," while "Shelly showed a willingness and ability to set aside her unhappiness and facilitate visits between Mary and Jackie." The court suggested Shelly's and Barbara's concerns about Lyle's interactions with their vulnerable mother were not unwarranted, noting:

> Lyle's conduct in the trial was alarming. He refused to comply with a subpoena on the first day. The court issued a warrant for his arrest. He appeared voluntarily on the second day, but his testimony was often evasive, confrontational[,] and unconvincing. He has been the recipient of transfers of large amounts of money from Mary. His explanations for the payments were flippant and, to a great degree, raise concerns about his ability to manipulate Jackie and Mary.

Over Shelly's resistance, the court appointed Green State Credit Union as permanent conservators for Mary (this ruling is not being challenged on appeal). Finally, the court concluded the 2012 durable medical power of attorney was valid but suspended it because it overlapped with the duties of the guardian and "will lead to direct conflict with the guardian as demonstrated by recent and long-term family history."

Jackie appeals.

## II. Standard of Review.

Actions for the involuntary appointment of guardians and conservators are tried at law. *See* Iowa Code § 633.33 (2022). Thus, we review for the correction of legal error. *See* Iowa R. App. P. 6.907. That means we are bound by the

findings of fact if supported by substantial evidence. Iowa R. App. P. 6.904(3)(a). Substantial evidence exists if we may reasonably infer the finding from the record. *In re Conservatorship of Deremiah*, 477 N.W.2d 691, 693 (Iowa Ct. App. 1991).

"As for the selection of a guardian, the district court has discretion to decide who might best serve in that fiduciary capacity." *In re Guardianship of Turner*, No. 18-1361, 2019 WL 3945973, at *2 (Iowa Ct. App. Aug. 21, 2019) (citing *In re Guardianship & Conservatorship of Reed*, 468 N.W.2d 819, 822–23 (Iowa 1991)). "We will not interfere in that selection unless the challenger shows a clear abuse of discretion in making the appointment." *Id.* (citing *Arent v. Arent*, 32 N.W.2d 660, 661 (Iowa 1948)).

## III. Discussion.

### A. Guardianship.

Pursuant to Iowa Code section 633B.108(1):

> Under a power of attorney, a principal may nominate a conservator of the principal's estate or guardian of the principal's person for consideration by the court if proceedings for the principal's estate or person are begun after the principal executes the power of attorney. Except for good cause shown or disqualification, the court shall make its appointment in accordance with the principal's most recent nomination.

Here, Mary signed a durable power of attorney on April 27, 2022, which nominated Jackie to be appointed her guardian if it became necessary. The power of attorney was signed about a month before either sister filed their petition to be named Mary's guardian and conservator. Yet the district court appointed Shelly instead of Jackie after it concluded the 2022 power of attorney was invalid due to "clear and convincing evidence that Mary lacked the capacity to enter into a contract on April 27th, 2022" and that there was good cause to appoint Shelly due to "Jackie's

isolation of Mary between May and June, [2022] and Lyle/Jackie's manipulation of Mary."

Jackie challenges the district court's appointment of Shelly as guardian of their mother. She contests the district court's determination that the 2022 power of attorney was invalid because of Mary's lack of competency when she signed it. *See In re Est. of Faris*, 159 N.W.2d 417, 420 (Iowa 1968) ("It is essential to the validity of a contract that the parties thereto possess not only the legal status affording capacity to contract, . . . but also the mental competence affording capacity to consent." (citation omitted)).

Attorney Jerry Schnurr—who was *Jackie's* attorney at the time the power of attorney was signed—testified that he "had a nice conversation with" Mary for approximately forty-five minutes before she signed the power of attorney on April 27, 2022, and he believed she was mentally competent to do so. This is unlike the attorney in *Turner*, who knew the principal "over several years of legal representation" before she signed the power of attorney and who was aware of the principal's cognitive decline and took purposeful steps to ensure she showed no signs of incapacity at the time she signed. *See* 2019 WL 3945973, at *3–4. And, like the district court, we question the reliability of Attorney Schnurr's opinion since—less than one month later—he helped Jackie prepare the petition for involuntary guardianship of Mary, which stated Mary's "decision-making capacity [was] so impaired that [she] is unable to make, communicate or carry out important decisions," that she had "been diagnosed with dementia," and that she was "able to do some activities of daily living with assistance but needs help with cognitive decision making."

The evidence from trial did not establish that Mary was competent in late April and then, after a quick decline, became incompetent in late May (when it was undisputed that Mary's decision-making capacity was so impaired to need a guardian and conservator). Rather, the evidence was that Mary had needed her daughters' help to pay her bills, to set up and attend medical appointments, to take her medications as prescribed, and more for a period of time leading up to April 2022, when the daughters became at loggerheads and each began taking steps to ensure their control over Mary's future. According to Shelly's petition for guardianship in May 2022, Mary "ha[d] been suffering from the early onset of dementia for the past two years or more" by that point.

Substantial evidence supports the district court's determination that Mary lacked competency when she signed the power of attorney in 2022, making it invalid. And without the 2022 power of attorney being valid, there was no reason to start with the presumption that Jackie should be appointed guardian. *Cf.* Iowa Code § 633B.108(1) ("Except for good cause shown or disqualification, the court shall make its appointment in accordance with the principal's most recent nomination.").

Instead, when deciding whether Jackie or Shelly should be Mary's guardian, the sisters started on equal footing. *See Turner*, 2019 WL 3945973, at *4 ("If two or more statutorily qualified and suitable persons are seeking guardianship of an adult ward, the district court must exercise its discretion to determine which proposed guardian's appointment would best serve the interests and well-being of the ward."). The district court determined Shelly was the better choice for guardian, relying on the fact that after Jackie took their mother from Barb's home

(ostensibly for a haircut), she absconded with Mary to her own home and refused to allow Barbara and Shelly to have contact with Mary. Jackie cut off access even though Mary was used to daily contact with her daughters. And when the sisters continued to reach out, asking for a chance to see their mother, Jackie called the police and reported Shelly and Barbara were harassing her. Even at trial Jackie expressed doubt that she could ever come to agreement with her sisters concerning issues involving Mary without attorneys or court oversight.

Additionally, after Jackie filed a petition to become Mary's guardian and conservator—when she said under penalty of perjury that Mary was unable to make cognitive decisions—Jackie took Mary to the bank and withdrew $5000 in cash for Jackie. On the same day, Mary also wrote a check to Jackie for $2221, with Jackie using the funds to pay the taxes on the home Lyle owns. Shelly was not without her own errors in judgment—she testified she believed Mary was incompetent to sign the power of attorney on April 27, 2022, but urged that Mary had the capacity to sign documents that gave Shelly joint ownership with rights of survivorship over Mary's checking and savings accounts later that same day. Yet there was no evidence Shelly used this power to enrich herself.

The court visitor[2] and Mary's attorney, who each participated in the trial, opined that Shelly should be appointed guardian. The court visitor relied on his belief "that Shelly Zabel would deal fairly with all family members where [Mary] is concerned" and that it was Shelly's intention that [Mary] remain at Friendship Haven, which is in her best interest." Mary's attorney asserted:

---

[2] The district court appointed a court visitor pursuant to Iowa Code section 633.562.

> The evidence indicates that Shelly has the best ability to deal fairly with all family members as it relates to the guardianship. Shelly was an unequivocal advocate for Mary's placement at Friendship Haven, where everyone agrees Mary has thrived physically and medically. Shelly has agreed that Mary should continue to reside at Friendship Haven, which I agree is in her best interest. Mary is happy, safe and content at Friendship Haven. Regardless of who is appointed as guardian, the undersigned requests that the order provide Mary continue to reside at Friendship Haven absent further order of the court after a hearing on the issue. As the Court Visitor noted, Shelly has already spent considerable time and thought into her future service as guardian and demonstrated she has Mary's best interest in mind as it relates to guardianship issues.

For all these reasons, we conclude the district court did not abuse its discretion in appointing Shelly guardian rather than Jackie.

**B. Power of Attorney.**

Jackie challenges the district court's decision to suspend the 2012 medical power of attorney naming Jackie the successor agent for Mary, arguing the court lacks the authority to suspend the power given to her by Mary while competent and which Jackie held for nearly a decade without issue.

The district court based its decision on a practical concern—the medical power of attorney gave Jackie powers that overlapped with the powers Shelly was given as guardian, and it was likely this would lead to further conflict in the future. We understand the court's concern. But it did not cite to a statute or any case law giving it authority to suspend the medical power of attorney (for this reason or any other). And we have not found any authority that suggests the court has the power to do so in these circumstances.

Iowa Code section 633B.108(2) considers the suspension of a power of attorney when the court appoints a conservator of the principal's estate or property. But this provision does not involve the suspension of a *medical* power of attorney.

*Cf.* Iowa Code § 633B.103 (providing chapter 633B "applies to all powers of attorney except . . . [a] power to make health care decisions").

Iowa Code section 144B.8 controls revocation of a durable power attorney for health care. It allows a durable power attorney for health care to be revoked "at any time and in any manner by which the principal [i.e. Mary] is able to communicate the intent to revoke." It does not provide a mechanism for the court to outright revoke the power of attorney other than through the procedure contemplated by section 144B.6. *See id.* § 144B.8.

Iowa Code section 144B.6 addresses the authority of the district court sitting in equity to revoke or otherwise invalidate a power of attorney for health care when "acting in a manner contrary to the wishes of the principal." *Id.* § 144B.6(1). But this section provides an avenue for court action in a specific decision-making event when the person holding the power of attorney is alleged to be acting against the wishes of the principal.

The record here raises clear instances of concerning actions by Jackie, including her delay in arranging for a medical evaluation of Mary, her persistent inclusion of Lyle in Mary's care when Mary had expressed her fear of Lyle, and her opposition to residential care for Mary. But those events were not the subject of a petition in equity to revoke Jackie's power of attorney, although they did form part of the foundation for the court's decision at law to name Shelley as guardian under chapter 633B.

As guardian, Shelley has authority regarding health care for Mary, a situation which does overlap with Jackie's power of attorney. Yet without an authority giving the court the explicit power to override Mary's wishes regarding

her medical power of attorney, we agree with Jackie—the court lacked authority to suspend the 2012 medical power of attorney. We reverse this ruling.

**IV. Conclusion.**

The district court did not abuse its discretion in appointing Shelly guardian rather than Jackie; we affirm that decision. But the court lacked authority to suspend Mary's 2012 medical power of attorney naming Jackie as her agent in this circumstance, so we reverse that decision.

**AFFIRMED IN PART AND REVERSED IN PART.**